[Cite as *Taylor v. Norfolk S. Ry. Co.*, 2020-Ohio-2657.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Paul Taylor

     Appellant

v.

Norfolk Southern Railway Company

     Appellee

Court of Appeals No. E-18-036

Trial Court No. 2016-CV-0196

**<u>DECISION AND JUDGMENT</u>**

Decided: April 24, 2020

* * * * *

Charles M. Murray, Florence J. Murray and Joseph A. Galea,
for appellant.

David A. Damico, Edwin B. Palmer and Ira L. Podheiser,
for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Erie County Court of Common Pleas which entered a judgment on a jury verdict in favor of appellee. For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 2} On March 10, 2016, as amended on March 30, 2017, plaintiff-appellant Paul Taylor filed a complaint against his employer, defendant-appellee Norfolk Southern Railway Company, setting forth claims of breach of duty to provide a safe working environment and negligence under the Federal Employer's Liability Act, 45 U.S.C. 51-60 ("FELA"), for exposing him and others to harmful levels of "occupational noise." Appellant alleged that as a machinist for appellee at a local railyard since 2005, he was required to work in close proximity to locomotives and other railroad equipment that emitted excessive noise during railyard operations that, even with protective devices, resulted in his tinnitus. Appellee generally denied the allegations and asserted a number of affirmative defenses.

{¶ 3} Discovery by the parties ensued, and each retained expert witnesses. In response to a flurry of disputed motions in limine, the trial court ruled on 12 in limine motions on March 27, 2018, held a *Daubert* hearing for unresolved in limine matters on April 6, 2018, and received post-hearing briefing by the parties. The trial court then ruled on the remaining in limine matters on April 19, 2018. After additional pre-trial disputes were resolved by the trial court, a seven-day jury trial began on May 15, 2018. On May 24, 2018, the jury returned a verdict in favor of appellee, which was journalized on June 8, 2018. Appellant then timely filed this appeal setting forth seven assignments of error:

I. The trial court erred by excluding the testimony of Plaintiff's treating physician pursuant to *Daubert* standards.

2.

II. The trial court erred by failing to grant Plaintiff's motion for a continuance to obtain a new medical expert witness.

III. The trial court erred by permitting the Defendant to make comments regarding the economic activity created by Defendant's operations at the Moorman Yard.

IV. The trial court erred by denying Plaintiff's motion for a jury view.

V. The trial court erred by limiting Plaintiff's cross-examination of a defense witness on the basis that the cross-examination concerned matters protected by the work product doctrine.

VI. The trial court erred by permitting Defendant to make a closing argument suggesting that railroad workers assume certain level of risk inherent in their employment.

VII. The trial court's cumulative error was sufficiently prejudicial to Plaintiff as to deprive the Plaintiff of a fair trial.

## A. Evidence Admissibility

{¶ 4} We will address all assignments of error together as they collectively challenge the trial court's decisions on the admissibility of evidence at trial. We review a trial court's decision on admissibility of evidence, including decisions granting or denying motions in limine, for an abuse of discretion. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22. Abuse of

3.

discretion "'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

## 1. Excluding Expert Testimony

{¶ 5} In support of his first assignment of error, appellant argued the trial court erred when it excluded his treating otolaryngologist, Erik W. Nielsen, M.D., from testifying as to his expert opinions on the medical causation of appellant's tinnitus. Appellant argued although the trial court correctly recognized Dr. Nielsen as an expert, it erred when it determined Dr. Nielsen was not qualified to provide an opinion on the medical causation of tinnitus pursuant to Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Appellant urged us to follow our decision "on the reliability of the doctors' causation opinions" when the practitioner relied on his patient for the workplace exposure and medical history in *Cutlip v. Norfolk Southern Corp.*, 6th Dist. Lucas No. L-02-1051, 2003-Ohio-1862, ¶ 47.

{¶ 6} In response, appellee argued the trial court did not err because Dr. Nielsen's differential diagnosis of appellant's tinnitus was based on unreliable speculation.

### i. FELA Negligence

{¶ 7} FELA provides, "Every common carrier by railroad while engaging in commerce * * *, shall be liable in damages to any person suffering injury while he is

employed by such carrier in such commerce, * * * for such injury * * * resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier * * *."  45 U.S.C. 51.

{¶ 8} A FELA plaintiff has the burden to prove four elements.

> [The] plaintiff must present more than a scintilla of evidence to prove that:  (1) an injury occurred while the plaintiff was working within the scope of his or her employment with the railroad, (2) the employment was in the furtherance of the railroad's interstate transportation business, (3) the employer railroad was negligent, and (4) the employer's negligence played some part in causing the injury for which compensation is sought under the Act.

*Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258-59 (6th Cir.2001).  In this case, the parties stipulated to the first two FELA elements, leaving the jury to determine the third and fourth elements of appellant's FELA claim, known as FELA negligence and FELA causation, respectively.

> [FELA] imposes liability only for negligent injuries.  But the issue of negligence is one for juries to determine according to their finding of whether an employer's conduct measures up to what a reasonable and prudent person would have done under the same circumstances.  And a jury should hold a master "liable for injuries attributable to conditions under his control when they are not such as a reasonable man ought to maintain in the

circumstances," bearing in mind that "the standard of care must be commensurate to the dangers of the business." *Wilkerson v. McCarthy*, 336 U.S. 53, 61, 69 S.Ct. 413, 93 L.Ed. 497 (1949), quoting *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610 (1943).

{¶ 9} While state and federal courts have concurrent jurisdiction over FELA claims, federal law governs FELA claims. *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 165, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007), citing 45 U.S.C. 56. When FELA cases are adjudicated in a state court, state procedural rules will apply, "but the substantive law governing them is federal.'" *Vance v. Consol. Rail Corp.*, 73 Ohio St.3d 222, 227, 652 N.E.2d 776 (1995), quoting *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985).

That FELA is to be liberally construed, however, does not mean that it is a workers' compensation statute. We have insisted that FELA "does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." And while "[w]hat constitutes negligence for the statute's purposes is a federal question," we have made clear that this federal question generally turns on principles of common law: "[T]he Federal Employers' Liability Act is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." * * * Thus, although common-law principles

6.

are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis. (Citations omitted.)

*Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543-44, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994).

{¶ 10} Appellant heavily relies on our decision in *Cutlip* to support this assignment of error. However, unlike this case, the jury in *Cutlip* found the railroad was negligent under FELA, and then proceeded to determine FELA causation. The May 24, 2018 jury verdict in this case unanimously answered "No" in response to interrogatory No. 1, which asked, "Do you find that Norfolk Southern Railway Company was negligent in failing to provide Paul Taylor with a reasonably safe place to work?" As instructed by the trial court, "If six or more of you answer no, your deliberations are complete. Answer no more Interrogatories and sign the General Verdict Form for the defendant," which the jury did. The jury did not reach interrogatory No. 2 on FELA causation, nor the remaining interrogatories Nos. 3 through 7. The verdict form unanimously signed by the jury found in favor of appellee and against appellant.

{¶ 11} "To prevail on a FELA claim, a plaintiff must 'prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation.'" *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir.1990), quoting *Robert v. Consol. Rail Corp.*, 832 F.2d 3, 6 (1st Cir.1987).

7.

**{¶ 12}** For the duty prong of FELA negligence, we find the record shows appellee had a duty, irrespective of Dr. Nielsen's testimony, to provide appellant with a reasonably safe work environment. "There is no doubt that an employer has a responsibility under the FELA to provide a safe place to work." *Vance* at 231, citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 558, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987). "FELA is a negligence-based statute. A railroad's duty under FELA is to provide for its employees a 'reasonably safe place to work.' 'Reasonableness' is measured by what a reasonably prudent person (or in this case, railroad) would have or could have anticipated under similar circumstances." (Citations omitted.) *Cutlip*, 6th Dist. Lucas No. L-02-1051, 2003-Ohio-1862, at ¶ 68.

**{¶ 13}** For the next prongs of FELA negligence, whether appellee breached its duty to appellant and whether injury was foreseeable, we find those were jury questions to determine whether appellee provided appellant a reasonably safe place to work.

> The jury, therefore, must be asked, initially: Did the carrier "fai[l] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances[?]" In that regard, the jury may be told that "[the railroad's] duties are measured by what is reasonably foreseeable under like circumstances." Thus, "[i]f a person has no reasonable ground to anticipate that a particular condition * * * would or might result in a mishap and injury, then the party is not required to do anything to correct [the] condition." If negligence is proved, however, and

8.

is shown to have "played any part, even the slightest, in producing the injury," then the carrier is answerable in damages even if "the extent of the [injury] or the manner in which it occurred" was not "probable" or "foreseeable." (Citations omitted.)

*CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703-04, 131 S.Ct. 2630, 180 L.Ed.2d 637 (2011).

{¶ 14} The record shows the trial court clearly instructed the jury, "Before you impose liability on Defendant, you must still find that Defendant Norfolk Southern failed to exercise reasonable care under the circumstances." Because foreseeability is a fact issue under FELA, "'the right of the jury to pass on this issue must be liberally construed.'" (Citations omitted.) *Platt v. CSX Transp., Inc.*, 135 Ohio App.3d 280, 285, 733 N.E.2d 672 (6th Dist.1999).

{¶ 15} For reasons that will be discussed more thoroughly in the next section, the trial court redacted specific portions of Dr. Nielsen's videotaped testimony, and the redacted testimony was heard by the jury. We reviewed the record of Dr. Nielsen's original testimony and find he did not offer any testimony to support appellant's FELA claim that appellee was negligent in failing to provide appellant with a reasonably safe place to work or to provide reasonable hearing protection. Dr. Nielsen repeatedly testified his role as appellant's treating physician was not to evaluate any of those matters because it had "no bearing" on how he takes care of, or treats, his patients. In addition, Dr. Nielsen's redacted testimony to the jury did not offer any testimony to support

9.

appellant's claim of FELA negligence. Dr. Nielsen simply did not know about appellant's noise exposure at work, nor about appellant's practices using hearing protection devices nor whether the hearing protection appellee provided appellant was "appropriate." Dr. Nielsen testified that he had "no clue" about appellant's work for the railroad.

{¶ 16} Instead, the record shows the jury heard testimony at trial on FELA negligence from appellant, three of appellant's co-workers, and Thomas Thunder, a doctor of audiology and an industrial hygiene expert specializing in audiometrics. In sum, appellant's witnesses collectively testified that appellant's work environment was not reasonably safe because appellee was aware of appellant's tinnitus; employees raised concerns about inadequate hearing protection with management during safety committee meetings; appellee refused to build a wall between the noise source, retarders, and the portion of the railyard where appellant worked; and hearing protection provided by appellee was inadequate.

{¶ 17} It is well-settled a jury, as the fact finder in either a criminal or civil case, primarily determines the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Since it is clear from the record the jury received appellant's evidence to support his FELA negligence claim, and Dr. Nielsen's redacted testimony did not deny appellant the jury's role to "pass" on FELA negligence, we will not disturb the jury's verdict appellee was not negligent.

10.

### ii. FELA Causation

{¶ 18} Despite our decision on the foregoing, we will next review appellant's first assignment of error on FELA causation in order to evaluate his overall FELA claim.

{¶ 19} We are mindful the causation element of common-law negligence is not the same in a FELA claim because common-law causation is expressly rejected in the text of the FELA statute. "The charge proper in FELA cases, we hold, simply tracks the language Congress employed, informing juries that a defendant railroad caused or contributed to a plaintiff employee's injury if the railroad's negligence played any part in bringing about the injury." *McBride*, 564 U.S. at 688, 131 S.Ct. 2630, 180 L.Ed.2d 637. The U.S. Supreme Court has interpreted the causation element of FELA claims as "'the test for proximate causation applicable in FELA suits.'" (Citation omitted.) *Id.* at 700.

{¶ 20} The quantum of evidence under FELA "sufficient to present a jury question of causation is less than it is in a common law tort action. * * * This does not mean, however, that FELA plaintiffs need make no showing of causation. Nor does it mean that in FELA cases courts must allow expert testimony that in other contexts would be inadmissible." *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 503 (9th Cir.1994).

### a. Expert Testimony

{¶ 21} Medical testimony evidence in a FELA case must have some reasonable basis and have some degree of certainty. *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir.1990). Speculative medical testimony is inadmissible unless the medical expert can articulate "that it is likely that the defendant's negligence, or more than possible that the

defendant's negligence, had a causal relationship with the injury." *Id.* at 964. The expert does not need to testify to a reasonable degree of medical certainty in order to be admissible. *Id.* The jury's function to find causation under FELA is to determine all the factual issues in order to reasonably draw the particular inference or conclusion submitted to it, that there was more than a possibility a causal relation existed between the employer's negligence and the employee's injury. *Id.* at 963. "Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 510, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

{¶ 22} Tinnitus is a "subjective ringing, buzzing, tinkling, or hissing sound in the ear. For some patients, this causes only minor irritation; for others, it is disabling." *Tarr v. Commr. of Social Sec.*, N.D.Ohio No. 3:12 CV 1090, 2013 WL 1363582, *1, fn. 1 (Apr. 2, 2013), citing Taber's Medical Cyclopedic Dictionary (2011).

{¶ 23} The parties do not dispute that Dr. Nielsen is an expert, as appellant's treating otolaryngologist. However, not all expert testimony is automatically admissible at trial. "Expert testimony in Ohio is admissible if it will assist the trier of fact in search of the truth. However, when such knowledge is within the ken of the jury, expert testimony is inadmissible." *State v. Koss*, 49 Ohio St.3d 213, 216, 551 N.E.2d 970 (1990). "It is a settled rule that, 'Unless a matter is within the comprehension of a layperson, expert testimony is necessary.'" *Migliori v. Merritt*, 6th Dist. Lucas No.

12.

L-11-1136, 2012-Ohio-3614, ¶ 13, quoting *Ramage v. Cent. Ohio Emergency Servs., Inc.,* 64 Ohio St.3d 97, 102, 592 N.E.2d 828 (1992).

{¶ 24} "[N]othing in [FELA] alters the accepted fact that unless the connection between the negligence and the injury is a kind that would be obvious to laymen, expert testimony is required." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 643 (7th Cir.2010), citing *Brooks v. Union Pacific R. Co.*, 620 F.3d 896, 899 (8th Cir.2010); *Claar* at 504 ("expert testimony is necessary to establish even that small quantum of causation required by FELA" where drawing a particular conclusion requires specialized knowledge).

{¶ 25} We review a trial court's decision related to the use of expert-opinion testimony for an abuse of discretion. *Brummitt v. Seeholzer*, 6th Dist. Erie No. E-16-020, 2019-Ohio-1555, ¶ 23.

{¶ 26} Evid.R. 702 requires appellant to prove a three-part test for Dr. Nielsen's expert testimony:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

13.

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 27} In addition, appellant must meet the tests of relevance and reliability of Dr. Nielsen's expert testimony under *Daubert*: "the trial court must act as a 'gatekeeper' to ensure both the relevance and the reliability of expert testimony before it is admitted at trial." *Cutlip*, 6th Dist. Lucas No. L-02-1051, 2003-Ohio-1862, at ¶ 42, citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469. In doing so, a trial court may conduct a flexible analysis of the reliability of the expert's opinion and consider all relevant factors, including these four: "(1) whether the testimony is based on a theory or method that has or can be tested; (2) whether the testimony is based on a theory or method that has been subject to peer review; (3) the error rate of the particular theory or

method; and (4) whether the theory or method has gained general acceptance in the field." *Id.*

### b. Motion in Limine

{¶ 28} "A motion in limine is a precautionary request directed to the discretion of the court to limit introduction of specified evidence until its admissibility may be determined outside the presence of the jury." *O'Loughlin v. Ottawa St. Condominium Assn.*, 6th Dist. Lucas No. L-16-1128, 2018-Ohio-327, ¶ 46. Appellant must show the exclusion of Dr. Nielsen's testimony affected appellant's substantial rights. *Id.* at ¶ 47, citing Evid.R. 103(A); Civ.R. 61 (harmless error unless the exclusion of evidence affected the substantial rights of the parties).

{¶ 29} Dr. Nielsen was deposed on June 2, 2017, and the deposition transcript is in the record. On September 15, 2017, appellee filed a motion in limine to exclude Dr. Nielsen's expert testimony on medical causation alleging his methodology failed to satisfy the admissibility standards under Evid.R. 702 and *Daubert*. Appellee alleged Dr. Nielsen consulted no scientific data or studies, as required by Evid.R. 702 and *Daubert*, before forming his opinion appellant's tinnitus was medically caused, in part, by the noise environment at appellant's work. Dr. Nielsen neither knew what appellant did at his job nor to what noise appellant's job exposed him. Dr. Nielsen assumed the medical causes were a combination of appellant's self-reporting of his noise exposure at work and from shooting rifles and guns for recreation. Dr. Nielsen did not prepare a report of his expert opinion.

15.

{¶ 30} Appellant opposed the motion on October 27, 2017. Then Dr. Nielsen was deposed, again, on March 22, 2018, on videotape, and his opinion on medical causation remained unchanged, nor did he prepare an expert report. The transcript of his videotaped deposition is also in the record.

{¶ 31} On March 27, 2018, the trial court denied the September 15, 2017 motion in limine to the extent it sought to exclude all of Dr. Nielsen's testimony, and then set the matter, along with another disputed expert opinion, Thomas Thunder, Au.D., for an evidentiary *Daubert* hearing on April 6, 2018. The trial court concluded in its judgment entry:

> So this issue boils down to whether Dr. Nielsen did a proper or thorough differential diagnosis to reach his opinion as to causation in this case. Based on the record, * * *, this Court finds that it is prudent to set this for Evidentiary Hearing so this Court can have the benefit of a complete record and not be limited to Dr. Nielsen's discovery deposition to make this important decision.

{¶ 32} The transcript of the April 6, 2018 hearing is in the record. Dr. Nielsen did not attend the April 6, 2018 *Daubert* evidentiary hearing, and the reason for his absence is not in the record. In the end, the trial court only had Dr. Nielsen's March 22, 2018 videotaped deposition with which to make the important determination of Dr. Nielsen's expert differential diagnosis on medical causation. No report or other data relied upon by Dr. Nielsen is part of the record of his videotaped deposition.

16.

{¶ 33} On April 19, 2018, the trial court granted the motion to exclude Dr. Nielsen's testimony only as to medical causation because:

(4) From Dr. Nielsen's testimony, with the exception of him performing auditory brainstem response (ABR), it is very apparent that his causation opinion is predicated, and totally reliant upon, what Plaintiff told him. Dr. Nielsen did not know anything about the occupational exposure of Plaintiff to noise. Dr. Nielsen had no understanding of the nature of Plaintiff's job duties; no conversation with Plaintiff about specific noise exposures on the job and never looked at any quantifiable data. Dr. Nielsen could not explain the pattern of asymmetrical hearing loss to work exposure. Dr. Nielsen testified at one point that he "had no clue" what Plaintiff did at work. Dr. Nielsen made no inquiry into or assessment of what hearing protection Plaintiff used on the job.

{¶ 34} Then on April 25, 2018, appellee objected to, and sought redaction of specific portions of Dr. Nielsen's March 22, 2018 video deposition in light of the trial court's ruling. Appellant opposed the motion, and on May 9, 2018, the trial court ruled on all of the pending objections and ordered very specific redactions of Dr. Nielsen's video deposition with respect to medical causation. On the fourth day of trial, Dr. Nielsen's redacted video deposition was played for the jury.

17.

{¶ 35} For the reasons stated herein, we find the trial court did not abuse its discretion when it determined Dr. Nielsen's expert testimony on his differential diagnoses was not reliable under Evid.R. 702 and *Daubert*.

### c. Differential Diagnosis

{¶ 36} This court recognizes evidence of differential diagnosis, also known as differential etiology or the study of causation, for the reliability prong under *Daubert*. *Cutlip,* 6th Dist. Lucas No. L-02-1051, 2003-Ohio-1862, at ¶ 45-46, citing *Hardyman*, 243 F.3d at 260-61.

> Differential diagnosis is defined for physicians as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable. (Citations omitted.)

*Id.* at ¶ 45; *Hardyman* at 260.

{¶ 37} "Because differential diagnosis is essentially a learned process of elimination, it naturally requires the physician to consider all possible causes and to discard those that are least likely. * * * [T]he physician ought to be able to offer a reasonable explanation as to why the physician's conclusion remains reliable." *Cutlip* at

¶ 47. The use of differential diagnosis to determine FELA causation "is appropriate only when considering potential causes that are scientifically known." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 22, citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999).

{¶ 38} While conducting a *Daubert* analysis of the reliability of the expert's opinion, the focus of the flexible analysis is on the principles and methodology employed by the witness rather than the conclusions drawn. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611-12, 687 N.E.2d 735 (1998), citing *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469.

> But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a [trial] court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Merely labeling a methodology as a "differential diagnosis" does not automatically make it reliable under *Daubert*:

> but prompts three more [questions]: (1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the

rejected causes?  If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached.

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir.2010).

{¶ 39} On the fourth day of trial Dr. Nielsen testified to the jury via videotape as appellant's treating otolaryngologist.  "[E]ven without expert testimony on specific causation, a jury still could reasonably infer causation based upon admissible testimony alone."  *Hardyman*, 243 F.3d at 269.  Specifically, the trial court stated in its March 27, 2018 judgment entry, "Dr. Nielsen can testify as to his observations, treatment, and his opinion on permanency of the hearing loss. * * * It is beyond question that a treating physician/clinician can render an opinion based on the theory (or application of) a differential diagnosis or differential etiology."

{¶ 40} "Such testimony, even without expert causation testimony, certainly would be adequate to provide a jury with the 'special expertise * * * necessary to draw a causal inference.'"  *Id.*, citing *Claar*, 29 F.3d at 504.  Dr. Nielsen testified that appellant had tinnitus and, based on his knowledge and experience, determined the diagnostic cause was noise exposure, which he assumed was from appellant's self-reporting of shooting guns and his work environment.  "Finally, nothing would preclude Plaintiff from testifying as to his work and non-work-related activities," which appellant did.  *Id.*

{¶ 41} We reviewed the record and find that Dr. Nielsen was able to testify to the jury extensively as to his opinions of his diagnosis of appellant's tinnitus and of its causes, from which the jury could infer was his work environment.  In addition, the jury

heard appellant and other witnesses generally claim that appellee's work environment caused hearing injuries.

{¶ 42} Dr. Nielsen testified that in November 2015 his, "Diagnosis was that [appellant] had noise effects on the inner ear in both ears and other specified hearing losses on the left, which just means * * * that ear hears worse than the right, that was my diagnosis at the time." He then diagnosed tinnitus based on appellant's own complaints.

Q: You don't know when his tinnitus began, correct?

A: No.

Q: And while we're talking about tinnitus, tinnitus is a subjective condition, correct?

A: Yes, it is.

Q: There's no test to definitely confirm that Mr. Taylor has it or how bad it is, correct?

A: No, there's not.

Q: We have to take his word on that, correct?

A: Yes.

* * *

Q: And you haven't assigned any impairment or hearing impairment percentage to him, correct?

A: I wouldn't do that anyway.

{¶ 43} Dr. Nielsen testified that, "hearing loss can happen because your ear bones are damaged because * * * the eardrum or the inner ear, the nerve itself is damaged, or there could be a growth or something on the nerve itself going into the brain." As to potential causes of tinnitus, he testified, "there's different ways you can cause permanent damage. Otherwise, permanent damage can be caused by continuous exposure or a very loud exposure."

{¶ 44} Dr. Nielsen testified that his goal was to "figure out the cause" of appellant's tinnitus in order to render the proper treatment. He testified being familiar with "the workplace environment and how it may cause some of the injuries." He testified he was familiar with publications that "discuss how hearing loss is occurring in the workplace." He testified that "occupational noise" can cause "hearing damage." He testified to conducting a differential diagnosis on appellant to try "to figure out * * * what's causing the presenting symptoms." He testified that in doing so, he was "coming up with obvious possibilities of what could be causing the problem, and the workup, the history, and everything you do is to limit it and become a more definitive diagnoses." He testified that as a physician he was "trying * * * to diagnose what is probable and try to help the patient with what is probably causing their concern."

{¶ 45} During Dr. Nielsen's testimony, the following potential causes of appellant's tinnitus were discussed before the jury: work, gunfire, tumor, smoking, and unusual/rare or "zebras" diagnosis. Dr. Nielsen dismissed without much discussion smoking or a "zebras" diagnosis. To rule out a tumor on a nerve causing the more

22.

significant tinnitus in the left ear, Dr. Nielsen suggested appellant undergo an auditory brainstem response ("ABR") test, the result of which was normal. Dr. Nielsen testified the ABR did not help him diagnose the cause of appellant's condition, but "it just eliminates a potential cause."

{¶ 46} Dr. Nielsen assumed gunfire noise exposure was a cause, particularly in light of appellant's asymmetrical hearing loss. Dr. Nielsen testified that his office first saw appellant in 2010, because "he had some testing done at work and then he was found to have some asymmetry and so then he was a little concerned. He came here to get a little more workup." Although Dr. Nielsen did not see or treat appellant until 2015, in 2010 appellant met with Dr. Nielsen's physician assistant, who tested appellant.

Q: So Paul underwent some testing on that day. Did he bring with him test results that he had from * * * the railroad? Does your chart show that?

A: I don't recall that there was anything, if there was. * * * I think he reported that he was told that there was hearing loss. * * * [The 2010 audiogram test results] tells me that the likelihood here is that he has had some noise exposure[.] * * * And since he reported using firearms, the left ear being worse is pretty classic, because when you shoot a rifle, the burst of noise will hit the left ear first. The head gets in the way, and so the right ear gets the shadow of the noise, which is much less.

* * *

Q: And to the extent that when [appellant] was deposed he testified that he did not wear hearing protection when discharging a rifle on multiple occasions, you would agree that that would be important to your opinions regarding the cause of Mr. Taylor's hearing loss.

A: I already assumed that it was caused by his gun.

* * *

Q: And would you agree, sir, that gunfire alone can cause the type and pattern of hearing loss that Mr. Taylor has.

A: Yes, it can.

{¶ 47} Dr. Nielsen also assumed noise exposure at appellant's work was a cause of the tinnitus, and appellant's tinnitus will continue.

Q: And you would agree that one of the principle characteristics of occupational noise-induced hearing loss * * * that [the American College of Occupational and Environmental Medicine] identify is that occupational noise-induced hearing loss is typically bilateral or it affects both ears the same because noise exposures in the workplace are generally symmetrical, correct?

A: Correct.

Q: And so you would agree, sir, that unless a worker is stationary and in the same spot with, like in this case, his left ear toward a constant

noise source, you would expect a person with occupational noise-induced hearing loss to have a symmetrical hearing loss, correct?

A: Yes.

* * *

Q: And, sir, Mr. Taylor does not have a stationary job where he is exposed to noise only on his left side, correct?

A: I don't know that.

* * *

Q: So does the [2010] record suggest that anyone told him that the noise at his job was causing the hearing damage?

A: Well, I don't believe that was discussed * * * to any degree. He said that he was an avid shooter and he has a lot of noise exposure. * * * [I]t wasn't designated whether it was work or not, but the assumption was obviously it was probably at work, in addition to * * * being someone who shoots guns and stuff.

* * *

Q: Okay. So let's tease out the very specific question. In terms of Paul Taylor, do you have an opinion to a reasonable degree of professional certainty as to whether his tinnitus will go away? Do you have an opinion to a reasonable degree of professional certainty, as a physician who's treated Paul Taylor and examined him a few times in your office, as to

whether the tinnitus that he has experience will, with reasonable medical certainty, continue?

A: I think it will continue.

{¶ 48} The record shows Dr. Nielsen's differential diagnosis did not identify potential work-related causes of appellant's tinnitus that are scientifically known. Aside from appellant's self-reporting that work was a cause, Dr. Nielsen did not consult any data or records to inform him of that causal relationship. *See Swords v. Norfolk & W. Ry. Co.*, 4th Dist. Scioto No. 95 CA 2342, 1996 WL 255859, *8 (May 8, 1996). When Dr. Nielsen testified he assumed work and gunfire noise exposure caused appellant's tinnitus, those assumptions, standing alone, did not meet the reliability test under Evid.R. 702 and *Daubert*. During Dr. Nielsen's testimony, he admitted he did not review any of appellant's work history records, including medical records, clinical history, audiograms, noise exposure, hearing protection devices or data, job duties, or photographs of appellee's railyard prior to rendering his medical causation opinion. Evid.R. 702(C); *Cutlip,* 6th Dist. Lucas No. L-02-1051, 2003-Ohio-1862, at ¶ 42; *Tamraz*, 620 F.3d at 674.

{¶ 49} We are mindful this court previously found that where a treating physician testifies he personally examined the FELA plaintiff, reviewed his medical records, took a history, ordered tests, reviewed the results of those tests, and ruled out other possible causes of the plaintiff's asthma, those actions were deemed a reliable differential diagnoses under Evid.R. 702 and *Daubert*. *Cutlip* at ¶ 48, citing *Hardyman*, 243 F.3d at

260-261. However, in this case Dr. Nielsen testified he did not review appellant's medical records or review data related to such medical records.

{¶ 50} Separately, the *Cutlip* court found, similar to this case, the record contained other evidence to support the treating physician's differential diagnosis. *Id.* at ¶ 56. Despite appellant's argument that the trial court's decision limiting Dr. Nielsen's testimony deprived the jury from hearing any evidence on the causation of appellant's tinnitus, we find that the jury still received evidence on FELA causation. The jury heard other testimony at trial, particularly from appellant and appellant's other expert, Dr. Thunder, that the work environment caused appellant's tinnitus. Dr. Thunder testified he tested the railyard noise:

> Q: And based upon your training, experience, and research in the field, are you able to describe for the jury with professional certainty whether the noise that you heard in the Bellevue Yard emanating from these retarders can cause tinnitus with specific certainty?
>
> A: Yes.
>
> Q: What's your opinion, Doctor?
>
> A: My opinion of that kind of noise, based on its intensity, duration, and the character of the noise, meaning the frequency, puts people at risk of developing hearing damage.
>
> * * *

27.

Q: So if Paul Taylor works in the B Yard for three and four hours at the noise measurements that you found at Location A, is he at risk of hearing loss and tinnitus?

A: Yes.

{¶ 51} We reviewed the entire record and find the jury in this case, like in *Cutlip*, received sufficient evidence in which it could have determined appellee was negligent under FELA in order to proceed to the issue of whether appellee's negligence caused, in whole or in part, appellant's tinnitus. *In re Estate of Flowers*, 2017-Ohio-1310, 88 N.E.3d 599, ¶ 83 (6th Dist.). As previously noted, unlike in *Cutlip*, the jury in this case determined appellee was not negligent. We will not disturb the jury's verdict that did not reach FELA causation because it was not manifestly against the weight of the evidence after every reasonable intendment and every reasonable presumption was made in favor of the judgment and the finding of facts. *Id.* at ¶ 94. We do not find Dr. Nielsen's redacted testimony to the jury deprived the jury of its duty to weigh the evidence and determine appellant's FELA claim. Put another way, we do not find Dr. Nielsen's original testimony would suddenly compel the jury to find appellee was negligent under FELA. *Smith v. Strong*, 6th Dist. Lucas No. L-17-1058, 2017-Ohio-6918, ¶ 12. We do not find the exclusion of portions of Dr. Nielsen's testimony affected appellant's substantial rights. Evid.R. 103(A); Civ.R. 61.

{¶ 52} We do not find the trial court abused its discretion when it granted appellee's motion in limine, in part, to exclude portions of Dr. Nielsen's videotaped

expert testimony opinion of medical causation of appellant's tinnitus. The jury heard Dr. Nielsen testify about his differential diagnosis, and it was the jury's duty to determine the reliability of his expert testimony based on his stated assumptions. In addition, the jury heard testimony from a number of witnesses, including Dr. Nielsen, as to how noise exposure at appellant's work is a cause of tinnitus. Ultimately, the jury decided who to believe and weighed the evidence to determine the lack of FELA negligence without determining FELA causation. We do not find the court's attitude was unreasonable, arbitrary or unconscionable.

{¶ 53} Appellant's first assignment of error is not well-taken.

### 2. Motion for Continuance

{¶ 54} In support of his second assignment of error, appellant argued the trial court erred when it denied his motion for a continuance because it would exceed the time limits set by the Supreme Court Rules of Superintendence. After Dr. Nielsen's testimony was limited by the trial court on April 19, 2018, appellant then filed on April 25, 2018, a motion to continue the May 15, 2018 trial for 90 days in order to find and depose an expert witness who can testify as to medical causation. Appellant argued appellee would only have been minimally prejudiced by the continuance, while his case was "severely prejudiced" by the trial court's delayed ruling.

{¶ 55} We review the grant or denial of a continuance by the trial court for an abuse of discretion. *Cherry v. Baltimore & O. Rd. Co.*, 29 Ohio St.2d 158, 160, 280 N.E.2d 380 (1972). We also review for abuse of discretion to the extent the trial court's

29.

denial of a continuance prohibited additional discovery to potentially admit more evidence at trial.

{¶ 56} Appellee opposed appellant's motion, and on May 2, 2018, the trial court denied the motion. The trial court stated in its judgment entry that the trial date was previously re-set twice. In addition, the *Daubert* hearing was held on April 6, 2018, at the conclusion of which the parties and the trial court held a lengthy discussion about scheduling. Upon mutual agreement, the parties submitted their post-hearing briefs on April 13, 2018, so that the trial court could review them on April 17 and 18, 2018, after attending to its criminal docket, and then issue a decision by the scheduled pre-trial on April 19, 2018. The trial court then timely journalized its decision on April 19, 2018. The trial court stated in its May 2, 2018 decision that during the April 19, 2018 pre-trial, appellant made no indication in the record he was considering a continuance in light of the court's decision that day limiting Dr. Nielsen's testimony on medical causation. The trial court stated it takes Ohio Supreme Court guidelines seriously, and "[t]his case is over guideline as of the end of March 2018." The trial court reviewed the extensive procedural history of the case and determined adhering to the Ohio Supreme Court's guidelines still allowed substantial justice to the parties.

{¶ 57} Based on our decision for the first assignment of error, we find this second assignment of error to be moot on the jury's verdict of FELA negligence. App.R. 12(A)(1)(c). Even if the second assignment of error were not moot, we find the trial

30.

court did not abuse its discretion when it denied appellant's motion for a continuance. We find the trial court's attitude was not unreasonable, arbitrary, or unconscionable.

{¶ 58} Appellant's second assignment of error is not well-taken.

### 3. Economic Activity Comments

{¶ 59} In support of his third assignment of error, appellant argued the trial court erred when it overruled his relevance objection when appellee asked appellant if he knew whether the opening of a new section of the railyard created any jobs. Appellant argued the result of the trial court allowing the jury to hear his testimony that the new section might have doubled the size of the yard and added 100 jobs was manipulating the jury into sympathizing with appellee as a job creator. "The jobs created by such an expansion have nothing to do with the elements of duty, breach, foreseeability, causation, or damages. * * * The trial court's failure to stop this line of questioning, or to provide any curative instruction, so grossly taints the jury's verdict as to result in reversible error."

{¶ 60} "The admission of relevant evidence pursuant to Evid.R. 401 rests within the sound discretion of the trial court." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶ 61} We reviewed the record and find the objection the trial court overruled occurred on the fourth day of trial. Immediately preceding the cross-examination

31.

question at issue was a line of questioning of appellant's job duties, occupational history, medical history and use of hearing protection.

> Q: Since the new bowl came on board, that's created over a hundred jobs, hasn't it.
>
> Ms. Murray: Objection.
>
> Court: Basis?
>
> Ms. Murray: Relevance.
>
> Court: Overruled. Continue.
>
> A: I really don't know how many.
>
> Q: They doubled the size, I think, of the yard and added a hundred jobs?
>
> A: It could be, yes.
>
> Q: No further questions.

{¶ 62} Immediately following the question at issue, on re-direct appellant responded to questions regarding the frequency and scope of his repair jobs or assignments at the yard in 2015, which was after the yard was expanded in 2014.

{¶ 63} We also reviewed appellant's closing argument to the jury and find that, unprompted, appellant stated the following:

> Paul asks you to be fair. He doesn't know what's a fair verdict. He asks you to do what you think is right under the circumstances. But let me suggest that defense counsel gave us some answers here. One of them, they

32.

asked Paul if the railroad created a hundred jobs. The company seemed to have chosen that a hundred jobs are worth the risk. * * *.

{¶ 64} During the entire course of the lengthy trial the trial court repeatedly ruled on objections raised by both parties. If the trial court erred in this particular evidentiary ruling, it was harmless, which appellant admits had "no bearing, even tangentially" on the elements of his claims or appellee's defenses.

{¶ 65} We do not find the trial court abused its discretion when it overruled appellant's relevance objection during trial. We do not find the trial court's attitude was unreasonable, arbitrary or unconscionable. We do not find a substantial right of appellant was affected by the trial court's evidence admissibility decision.

{¶ 66} Appellant's third assignment of error is not well-taken.

### 4. Jury View

{¶ 67} On April 17, 2018, appellant filed a motion for jury view, pursuant to R.C. 2315.02, arguing the jury's fact finding role would benefit from viewing the size and scale of the railroad operation and hear the volume, frequency and proximity of the "reality of the circumstances." Appellant sought specific views to be pointed out to the jury and that the jury wear hearing protection during the view. Appellant argued the jury view would not prejudice appellee.

{¶ 68} Appellee opposed the motion, and on May 2, 2018, the trial court's judgment entry states, "This Court holds that a Jury View is not necessary or proper and there is a danger of misleading the jury, and/or being prejudicial. Additionally, there are

33.

practical problems which hinder conducting a jury view in this particular case." The trial court reached its conclusion after analyzing five areas of concern:

> In sum, this Court finds that there is very, very little to be gained from the Jury View. There is greater danger the jury would be misled by sensory observation during the Jury View, which isn't evidence, and confuse that with what is relevant – Plaintiff's workplace experience and exposure. A jury view would not be representative of Plaintiff's job duties and placement in the railyard. Photographic and aerial exhibits can adequately display the size and scale of Defendant's operations; Plaintiff's position within the railyard and the location of the retarder vis-à-vis the locations Plaintiff most frequently works. Defendant's operational and safety rules serve as significant, if not impossible, impediments to conducting a jury view in this particular case.

{¶ 69} We review a trial court's decision on a motion for a jury view pursuant to R.C. 2315.02 for an abuse of discretion. *Davis v. State*, 118 Ohio St. 25, 34, 160 N.E. 473 (1928). R.C. 2315.02 states in relevant part:

> If the court is of the opinion that it is proper for the jurors to have a view of property which is the subject of litigation, or of a place where a material fact occurred, it may order them to be conducted in a body under the charge of an officer to such property or place, which shall be shown to them by a person appointed by the court for that purpose.

34.

{¶ 70} We are guided by the Ohio Supreme Court's reminder that a jury view is not, standing alone, evidence of any fact not otherwise established at trial. *Perry v. Eastgreen Realty Co.*, 53 Ohio St.2d 51, 55, 372 N.E.2d 335 (1978). "The view by the jury of the property which is the subject of litigation, or of the place where a material fact occurred * * * is solely for the purpose of enabling them to apply the evidence offered upon the trial." *Machader v. Williams*, 54 Ohio St. 344, 43 N.E. 324 (1896), syllabus.

{¶ 71} We find that what appellant sought through the jury view was to furnish evidence that it claimed could not be conveyed by other evidence admitted at trial; however, that is appellant's burden at trial. "A view of a premises is conducted for 'the purpose of enabling the trier of fact to understand and apply the evidence offered at trial' and 'is not conducted to gather evidence; rather, the case must be tried and determined upon the evidence offered at trial.'" (Citations omitted.) *Koller v. Zellman*, 11th Dist. Geauga No. 2018-G-0153, 2018-Ohio-2463, ¶ 25. Appellant testified, along with numerous other witnesses, as to the size and layout of the railyard, railyard operations, and the loud noises from those operations, among other facts.

{¶ 72} We reviewed the entire record and do not find the trial court abused its discretion when it denied appellant's motion for a jury view. We do not find the trial court's attitude was unreasonable, arbitrary or unconscionable.

{¶ 73} Appellant's fourth assignment of error is not well-taken.

## 5. Witness Cross-Examination

{¶ 74} In support of his fifth assignment of error, appellant argued the trial court erred when it limited his cross-examination of appellee's fact witness, Mark Dudle, appellee's corporate representative. Appellant questioned Mr. Dudle regarding a noise survey from 2015 and the underlying data collected by another person for that noise survey. Appellant wanted the jury to hear Mr. Dudle admit that the data collected by the other person, who was not a witness, was not in a document "in the Courtroom." After a sidebar during which appellee argued exclusion based on work-product privilege and irrelevance, appellant agreed to discontinue the question, and the trial judge struck the question, without objection.

{¶ 75} Nevertheless, appellant argued the evidence was relevant and not protected by the work-product privilege. Appellant argued the data was relevant because it "can establish whether noise levels in the Yard were sufficient to cause [appellant's hearing loss] * * * [and] establishes NS's possible knowledge of hazardous conditions in the Yard – which is directly relevant to NS's duty under FELA." According to appellant, "Paul should have been permitted to inquire of Dudle regarding the existence of the 2015 data; whether Dudle had seen it; whether it had been entered into evidence already at trial; and other topics related to the data." Appellant further argued because appellee failed to meet its burden of proving the work-product privilege applied, the jury should have heard this evidence which "would have weighed heavily on a central question

36.

considered by the jury (whether NS negligently failed to provide Paul with a reasonably safe place to work) * * *."

{¶ 76} The cross-examination question at issue occurred on the third day of trial:

Q: You've seen the data collected on the survey.

A: Yes.

Q: Okay. And – but we don't have that document in the Courtroom. We didn't see that by your testimony today, true?

{¶ 77} Appellee then requested a sidebar. According to the record, the following exchange concluded the sidebar:

Mr. Palmer: Well, we raised an objection. They never filed a motion to compel or never raised it with the Court. It's not employee testing and it could – I know it's been litigated in the other Court, but there – we filed a motion for reconsideration on issues still pending in that Court. I mean, it's not –

Mr. Murray: I'll move on. I'll move on.

Court: Okay.

Mr. Lyda: Could we ask that the jury disregard that, Judge?

Court: Well, I think it should be cleaned up, maybe ask if it was employee related.

Mr. Murray: No, I'm not going to do that.

Court: Okay. Then I'm going to strike it.

37.

{¶ 78} We review the trial court's decisions on the scope of cross-examination and the admissibility of evidence during cross-examination for an abuse of discretion. *Calderon v. Sharkey*, 70 Ohio St.2d 218, 222, 436 N.E.2d 1008 (1982); *O'Brien v. Angley*, 63 Ohio St.2d 159, 163, 407 N.E.2d 490 (1980). In this case, the trial court ordered stricken the disputed cross-examination question because appellant announced, "I'll move on. I'll move on"; did not withdraw the question; and refused to rephrase the question to determine relevance to this litigation. After the trial court ordered the question stricken, appellant did not object.

{¶ 79} Where appellant did not object on the record to the trial court's determination to strike the question appellant asked appellee's witness on cross-examination, he waived all but plain error. *Risner v. Ohio Department of Natural Resources*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 26-27. The Supreme Court of Ohio has instructed us to strictly limit the plain error doctrine "to the *extremely rare* case involving exceptional circumstances when the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." (Emphasis sic.) *Id.* at ¶ 27. We do not find the record shows this was such an exceptional circumstance.

{¶ 80} We reviewed the entire record and find appellant did not meet his burden to show there was an actual and obvious plain error from which the jury clearly would not have found in favor of appellee. We do not find the trial court abused its discretion when

38.

it struck appellant's cross-examination question.  We do not find the trial court's attitude was unreasonable, arbitrary or unconscionable.

{¶ 81} Appellant's fifth assignment of error is not well-taken.

### 6.  Closing Argument

{¶ 82} In support of his sixth assignment of error, appellant argued the trial court erred by overruling his objections to appellee's statements during closing arguments that were misstatements of the law, confused the jury, and was prejudicial to appellant. Appellant argued, "In a FELA action, assumption of the risk is not a defense to liability. Therefore, it is improper for the defense to argue, as it did, that a railroad worker like the Plaintiff has to expect some dangers to be present in the workplace."  Appellant further argued appellee's argument was not supported by the evidence and did not fairly characterize the evidence presented at trial.

{¶ 83} Prior to the start of appellee's closing argument on the sixth day of trial, the record shows the following sidebar exchange after appellant concluded his closing argument and before appellee commenced its closing argument:

Mr. Murray:  I wanted to object to the * * * exhibit * * * in light of the Court's ruling and the jury instructions.  It's a demonstrative that he's going to put up and it suggests some sort of risk.

Court:  What – what – what are you talking about?

Mr. Murray:  It's a – it's a board he's going to use.  He showed it to me, and we've talked about it, but Joe points out that after the instruction –

39.

Mr. Galea: Well, it really doesn't have to do with the instruction itself. Assumption of the risk is never in an FELA case, and so to the extent that that demonstrative will suggest that some workplaces are safer than others, I think that gets into assumption of the risk territory by saying almost that he's going to be in a situation where we can't make everything safe for him. Yes, that's true, but he's not assuming the risk of those type –

Mr. Lyda: We're not making an argument. The instruction is that the railroad (inaudible) ensure the safety of the employee.

Court: That's right.

Mr. Lyda: So –

Court: Yeah.

Mr. Murray: Okay.

Court: Assumption of the risk is not an issue.

Mr. Murray: I just didn't want you to be (inaudible).

Court: Yeah. No.

Mr. Murray: Give it (inaudible).

Court: I'll weigh that.

{¶ 84} Appellee then proceeded with closing arguments with one objection by appellant on a different issue:

Mr. Lyda: There was a member of the jury panel who said that he went to the Cleveland –

Mr. Murray: Objection, Your Honor.

Court: Basis?

Mr. Murray: You can't have a jury – a juror testify.

Court: Sustained.

{¶ 85} It is well established that closing arguments are not evidence for the fact-finder. *Stafford v. Columbus Bonding Ctr.*, 177 Ohio App.3d 799, 2008-Ohio-3948, 896 N.E.2d 191, ¶ 26 (10th Dist.), citing *State v. Frazier*, 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995). Parties are granted some latitude during closing argument "so long as counsel stays within the boundaries of the record." *Frazier* at 338. Counsel may comment during closing argument on evidence adduced at trial, except for "evidence which was excluded or declared inadmissible by the trial court or otherwise make statements which are intended to get evidence before the jury which counsel was not entitled to have the jury consider." *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 39, 543 N.E.2d 464 (1989), quoting *Drake v. Caterpillar Tractor Co.*, 15 Ohio St.3d 346, 347, 474 N.E.2d 291 (1984). Persistent abuse during closing argument may be grounds for a new trial. *Carper v. Snodgrass*, 6th Dist. Lucas No. L-03-1065, 2003-Ohio-6975, ¶ 15.

{¶ 86} We find the trial court explicitly instructed the jury that closing arguments are not evidence:

Court: This is closing arguments, and, once again, this is what you've seen in television and movies. This is where the parties are going to

be able to argue or a summation of what they believe their evidence has shown in their case.  The important thing to remember, and although they're both outstanding attorneys on both sides of the table, it's not evidence.  It's a summation of what they believe they have proven, okay, or what the evidence has shown and any reasonable inferences from that evidence, okay?

{¶ 87} We presume the jury followed the trial court's instructions.  *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 194.  In addition, appellant failed to show that the jury considered appellee's closing arguments as substantive evidence. *Grimm v. Summit Cty. Children Servs. Bd.*, 9th Dist. Summit No. 22702, 2006-Ohio-2411, ¶ 50.

{¶ 88} We reviewed the entire record and do not find the trial court abused its discretion when it overruled appellant's objection prior to appellee's closing argument. We do not find appellee persistently abused the scope of closing argument.  We find the trial court properly instructed the jury on the limitations of closing argument.  We do not find the trial court's attitude was unreasonable, arbitrary or unconscionable.

{¶ 89} Appellant's sixth assignment of error is not well-taken.

### 7.  Cumulative Error

{¶ 90} In support of his seventh assignment of error, appellant argued that the cumulative effect of all of the trial court's errors warrant reversal of the judgment and

42.

granting a new trial. Appellee responded that the trial court did not err, so there was no cumulative effect.

{¶ 91} This court has held that "the cumulative effect of errors occurring in a trial court's evidentiary rulings can deprive a party of a full and fair hearing." *Furr v. State Farm Mut. Auto. Ins. Co.*, 128 Ohio App.3d 607, 631, 716 N.E.2d 250 (6th Dist.1998). Where we find no trial court error to appellant's prejudice in any of the alleged assignments of error, there is no cumulative effect of errors that would have violated appellant's right to a full and fair hearing. *Id*.

{¶ 92} We reviewed the entire record and do not find the trial court cumulatively abused its discretion when it determined issues on admissibility of evidence throughout the course of this case and at trial. We do not find the trial court's attitude was unreasonable, arbitrary or unconscionable.

{¶ 93} Appellant's seventh assignment of error is not well-taken.

## B. Conclusion

{¶ 94} On consideration whereof, the judgment of the Erie County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

43.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Arlene Singer, J.
                                                 _____
                                                                           JUDGE

Thomas J. Osowik, J.
CONCUR.
                                                 _____
                                                                            JUDGE


Christine E. Mayle, J.
CONCURS AND WRITES
SEPARATELY.
                                                 _____
                                                                            JUDGE


**MAYLE, J.**

{¶ 95} I concur in the foregoing judgment. I write separately with respect to the first assignment of error because I believe that the trial court abused its discretion when it excluded the causation opinions of appellant's treating physician, Dr. Erik Nielsen. However, I nonetheless concur with the majority's decision to affirm the trial court judgment because I believe that the trial court's error was harmless.

44.

{¶ 96} The trial court granted appellee's motion in limine to exclude Dr. Nielsen's causation opinions because, as part of his differential diagnosis, Dr. Nielsen relied upon appellant's own statements that he was exposed to "loud noise" as a railroad employee. In its written opinion, the trial court stated that it excluded Dr. Nielsen's causation opinions because he did not have any information about appellant's specific job duties, nor did he have "any quantifiable data" regarding the "specific noise exposures on the job." The majority similarly concludes that Dr. Nielsen's causation testimony was inadmissible because he "did not review any of appellant's work history records, including medical records, clinical history, audiograms, noise exposure, hearing protection devices or data, job duties, or photographs of appellee's railyard prior to rendering his medical causation opinion." I disagree.

{¶ 97} Dr. Nielsen is not an industrial hygienist who evaluates workplace conditions or noise exposure assessments. Dr. Nielsen is a *treating physician* whose expertise is patient care in the medical field of otolaryngology. As appellant's otolaryngologist, Dr. Nielsen treated appellant after he narrowed down the probable cause of his hearing loss and tinnitus after taking a patient history, conducting a comprehensive physical examination, and reviewing medical records—including the results of multiple audiograms and an auditory brainstem response ("ABR") that his office conducted, as well as the medical records of appellant's physical exams with Dr. Nielsen's physician assistant. This is a well-established reliable methodology for medical

45.

testimony from a treating physician. *See, e.g., Cutlip v. Norfolk S. Corp.*, 6th Dist. Lucas No. L-02-1051, 2003-Ohio-1862, ¶ 45.

{¶ 98} Indeed, "[i]f Ohio courts considered the examination of a patient, review of his medical records, and the taking of his history to be an unreliable methodology, the bulk of all medical testimony would be inadmissible." *Hutchins v. Delco Chassis Sys.*, 2d Dist. Montgomery No. 16659, 1998 WL 70511, *4 (Feb. 20, 1998); *see also Warner v. DMAX Ltd., LLC*, 2d Dist. Montgomery No. 26644, 2015-Ohio-4406, ¶ 17. While Dr. Nielsen was not personally familiar with appellant's specific work conditions or specific levels of noise exposure, "[w]eaknesses in the factual bases of an expert's testimony go to the weight and credibility of the expert's testimony, not to its admissibility." *Dejaiffe v. KeyBank USA Natl. Assn.*, 6th Dist. Lucas No. L-05-1191, 2006-Ohio-2919, ¶ 19.

{¶ 99} In *Warner*, for example, a medical expert opined that plaintiff's injuries were "'caused by the push, pull movements and repetitive movements used to perform her job * * *.'" *Warner* at ¶ 19. The appellate court determined that this opinion was admissible even though the expert did not have any information about plaintiff's job duties other than information that the plaintiff provided herself. The expert witness in *Warner*—like Dr. Nielsen in this case—"was the treating physician, and he based his opinion on his records and what he perceived, which included his personal observations and his patient's description of her working environment." *Id.* at ¶ 17. The appellate court concluded that this was a reliable methodology and that the treating physician, testifying as a medical expert, "'could have been cross-examined relative to a possible

46.

change of opinion after being told of the prior and subsequent injuries [or different working conditions or duties], for the primary purpose of cross-examination is to test the accuracy, truthfulness, soundness, and thereby the credibility, of testimony given by a witness on direct examination.'" (Brackets sic.) *Id.*, quoting *Baird v. Cincinnati Transit Co.*, 110 Ohio App. 94, 99, 168 N.E.2d 413 (1st Dist.1959).

{¶ 100} Likewise, in *Hutchins*, 2d Dist. Montgomery No. 16659, 1998 WL 70511, at *5, the appellate court concluded that a treating physician's opinion that plaintiff's injuries were caused by a workplace accident was admissible even though the treating physician did not have any independent information regarding plaintiff's workplace other than information that was provided by the plaintiff himself. The appellate court explained that, under Evid.R. 705, an expert may provide opinions in response to hypothetical questions that assume the existence of facts outside the expert's own personal knowledge as long as those facts are somewhere in the record. *Id.* For example, "'[a]n expert giving an opinion not based upon his personal knowledge is in effect giving hypothetical testimony-"If A, B, and C are true, then, based upon my expertise in the area of fire causation, the defendant's act proximately caused the fire."'" *Id.*, quoting *Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec., Inc.*, 110 Ohio App.3d 732, 739, 675 N.E.2d 65 (2d Dist.1996). Thus, in this regard, the hypothetical questions to the doctor were appropriate. The court further noted that the treating physician did not rely "wholly" upon the plaintiff's history—as the defendant argued—because the physician

47.

performed his own physical examination and found that his opinion "was also supported by the consistency of [plaintiff's] injuries with his version of events * * *." *Id.* at *6.

Similarly here, Dr. Nielsen repeatedly testified that the medical records he reviewed were consistent with noise-induced hearing injuries. That is, after reviewing the initial audiogram that his office performed in 2010, Dr. Nielsen testified that it was likely that appellant had noise-exposure damage because "noise exposure classically will show this little drop worse at about 4000 hertz," which is what his 2010 audiogram showed. Dr. Nielsen further testified that appellant's 2015 audiogram showed "significant worsening" between 2010 and 2015, which was also consistent with noise exposure. The trial court did not exclude these statements.

{¶ 101} The trial court did, however, exclude all causation opinions that either depended upon statements that appellant made to Dr. Nielsen regarding appellant's work history, or that were given in response to a hypothetical question in which appellant's attorney "assumed" for purposes of questioning that appellant would testify regarding certain facts. For example, the trial court excluded Dr. Nielsen's testimony that "in view of his history, that * * * I believe he said that there was more noise at work [between 2010 and 2015] than there had been, that I felt that the ringing was probably—the worsening of his ringing was probably related to work." The trial court also excluded his testimony that, assuming that appellant testified that he was exposed to daily and routine noise emanating from the retarders at the railyard, such noise exposure "could be causing some additional hearing loss, but, more importantly, it would make—could make his

48.

tinnitus worse." The trial court also excluded his testimony that, assuming that the "only" noise exposure appellant had at the time was at the railyard, that it was "probable" that such noise exposure made his tinnitus worse. The trial court also excluded Dr. Nielsen's testimony that, assuming that appellant "stopped using guns except for one occasion between 2010 and 2016," that "[t]he worsening of the tinnitus I felt was related to his exposure at work." The court also excluded testimony in which Dr. Nielsen stated that, "from [appellant's] history, if he is no longer shooting guns and he shows change in his hearing, that exposure has—of greater sounds and louder sounds would definitely cause his tinnitus to be worse."

{¶ 102} The exclusion of such causation opinions was an abuse of discretion and contrary to the Ohio Rules of Evidence for several reasons. Under Evid.R. 705, "[t]he expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise." And under Evid.R. 703, an expert may provide testimony regarding "inferences" that are based upon facts outside his or her personal knowledge as long as such facts are otherwise contained in the record—which they were in this case.

{¶ 103} Most importantly, as the courts recognized in *Warner* and *Hutchins*, it is appropriate for a treating physician to base his or her opinion testimony on patient history, review of his medical records, and patient examination. Any weaknesses in Dr. Nielsen's "underlying factual assumptions may affect credibility, but do not affect

49.

admissibility." *Warner*, 2d Dist. Montgomery No. 26644, 2015-Ohio-4406, at ¶ 18. Indeed, in this case—as in *Warner*—the appellee's attorney *did* challenge Dr. Nielsen on cross-examination with a series of questions that revealed that "he was not personally familiar with all of the working conditions * * *" and that the plaintiff's own history "did not contain a complete recitation of all the facts * * *." *Id.* It should have been up to the jury to assess Dr. Nielsen's credibility after such weaknesses in his causation opinion were exposed through cross-examination. "The absence of certain facts, or the failure of proof of others, goes to the weight and credibility of the [expert] testimony, and not to its admissibility. The burden falls on the opposing party to discredit or minimize the expert's testimony through cross-examination, just as defense counsel attempted to do in this case." *Johnson v. Knipp*, 36 Ohio App.2d 218, 220, 304 N.E.2d 914 (9th Dist.1973)

**{¶ 104}** Moreover, Dr. Nielsen's differential diagnosis was an accepted and reliable methodology under Evid.R. 702. As this court recognized in *Cutlip*, 6th Dist. Lucas No. L-02-1051, 2003-Ohio-1862,

> "[d]ifferential diagnosis is defined for physicians as 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.' The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including

50.

laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable.

*Id.* at ¶ 45, quoting *Kannankeril v. Terminix Internatl., Inc.*, 128 F.3d 802, 807 (3d Cir.1997).

{¶ 105} And here, Dr. Nielsen actually did employ all of these techniques when performing his differential diagnosis—he and his PA performed comprehensive physical examinations of appellant, took appellant's medical history, and performed a variety of clinical tests, including audiograms and an ABR. As he performed these techniques, Dr. Nielsen systematically ruled out a tumor, smoking, and appellant's age as unlikely causes of appellant's hearing loss and tinnitus—thereby leaving noise exposure as the probable cause. Further, as Dr. Nielsen testified, appellant's audiograms were entirely consistent with appellant's self-reported noise exposure (and, also, an increase in noise exposure), which further supported his causation opinion. *Hutchins*, 2d Dist. Montgomery No. 16659, 1998 WL 70511, at *6 (physician's causation opinion "was also supported by the consistency of [plaintiff's] injuries with his version of events * * *.").

{¶ 106} The majority, however, finds that Dr. Nielsen's differential diagnosis was unreliable—and therefore inadmissible—because, unlike the plaintiff's expert witness in *Cutlip*, there is no indication that Dr. Nielsen reviewed any historical medical records.[1]

---

[1] The majority states that "Dr. Nielsen testified he did not review appellant's medical records or review data related to such medical records." But, from Dr. Nielsen's testimony, it is clear that he did review certain medical records—including records from

*See Cutlip* at ¶ 12 (stating that the physician knew from "*earlier* medical records" that plaintiff had used an inhaler in the past (emphasis added)) and ¶ 13 (stating that the physician had reviewed plaintiff's "*previous* medical records" (emphasis added)). Although we noted in *Cutlip* that the treating physicians had performed a "thorough deferential diagnosis," *id.* at ¶ 48, that does not suggest that those same exact techniques and processes are *always* required for a physician's differential diagnosis to be reliable and admissible. To the contrary, we expressly recognized in *Cutlip* that "'[a] doctor does not have to employ all of these [differential diagnosis] techniques in order for the doctor's diagnosis to be reliable.'" *Id.* at ¶ 45, quoting *Kannankeril* at 807. In fact, courts recognize that "there will be some cases in which a physician can offer a reliable differential diagnosis without examining the patient, looking at medical records, taking a medical history, and performing laboratory tests." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 762 (3d Cir.1994); *see also Kannankeril* at 808, quoting *Paoli* at 759 ("'to the extent that the district court concluded otherwise [i.e., that a differential diagnosis made on less than all types of information cannot be reliable], we hold that it abused its discretion.'" (Brackets sic.)).

{¶ 107} Again, in this case, Dr. Nielsen *did* examine the patient, *did* look at medical records, *did* take a medical history, and *did* perform various medical tests. Although he did not obtain and review all possible information that could conceivably

appellant's visits with his PA, the audiograms and ABR that his office performed, and his own medical records of his various examinations of the appellant.

52.

have some bearing on his analysis—i.e., he did not review appellant's historical medical records, nor did he gather information regarding appellant's job duties or specific workplace noise exposure levels—"any weaknesses in the factual basis of an expert witness' opinion * * * bear on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 342 (6th Cir.1993).

{¶ 108} In sum, given that Dr. Nielsen's differential diagnosis was a sufficiently reliable methodology, and given that it was appropriate for appellant's counsel to ask hypothetical questions under Evid.R. 705 with "assumed" facts that were otherwise in the record as required by Evid.R. 703, I believe that the trial court abused its discretion by excluding Dr. Nielsen's causation opinions.

{¶ 109} But, I believe that the trial court's error was harmless. *See* Civ.R. 61 ("[n]o error in either the admission or the exclusion of evidence * * * is ground for granting a new trial or for setting aside a verdict * * * unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). That is because the jury concluded that appellee did not breach its duty of care to appellant under the Federal Employer's Liability Act—i.e., the jury found that appellee did not fail to provide appellant with a reasonably safe place to work—and, therefore, did not reach the issue of causation. The trial court's error in excluding Dr. Nielsen's causation opinions was therefore harmless. *See Hopkins v. Mason*, 9th Dist. Medina No. 06CA0103-M, 2007-Ohio-4345, ¶ 11 (trial court's error in

53.

excluding expert testimony on damages was harmless because the jury did not find that appellee breached the contract at issue); *Grubbs v. Admr., Bur. of Workers' Comp.*, 5th Dist. Ashland No. CA 1236, 1998 WL 517693, *4 (Apr. 9, 1998) (trial court's error in excluding expert testimony was harmless because the plaintiff failed to establish a separate element of his workers' compensation claim).

{¶ 110} I therefore agree with the majority's decision to affirm the trial court judgment.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

54.