[Cite as *Smith v. Norfolk S. Ry. Co.*, 2025-Ohio-3122.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Kelly Smith

  Appellant

v.

Norfolk Southern Railway Company

  Appellee

Court of Appeals No. E-24-049

Trial Court No. 2021 CV 0440

**DECISION AND JUDGMENT**

Decided: September 2, 2025

\* \* \* \* \*

Florence A. Murray and Joseph A. Galea, for appellant.

David A. Damico and Edwin B. Palmer, for appellee.

\* \* \* \* \*

**MAYLE, J.**

{¶ 1} Plaintiff-appellant, Kelly Smith, appeals the September 10, 2024 judgments of the Erie County Court of Common Pleas, precluding testimony from Smith's expert witnesses and granting summary judgment in favor of defendant-appellee, Norfolk Southern Railroad Co. For the following reasons, we reverse the trial court judgment.

## I. Background

{¶ 2} Kelly Smith filed an action against his former employer, Norfolk Southern Railway Co., under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. 51-60. He claimed that high-intensity vibration of the power and pneumatic tools he used in his employment caused him to develop severe and debilitating carpal tunnel in both wrists, requiring surgery and ultimately rendering him occupationally disabled. Smith alleged that he suffered these injuries as the result of the railroad's breach of its duty to maintain a safe workplace. More specifically, he alleged that the railroad failed to provide sufficient administrative controls to reduce the risk of carpal tunnel caused by the use of power and pneumatic tools; failed to monitor him for development of carpal tunnel syndrome; failed to properly train him to avoid wrist and hand injuries; required him to perform job duties in an unergonomic manner; and failed to provide training for performance of job duties in an ergonomic manner.

{¶ 3} On March 31, 2022, the court entered a civil trial order setting pretrial deadlines, including a deadline for disclosing expert witnesses:

> **EXPERT WITNESSES (other than treating physicians):** Each counsel shall exchange with all other counsel, medical and expert witnesses expected to testify in advance of Trial. Plaintiff expert disclosure with reports shall be completed by October 31, 2022. Defendant's expert disclosure with reports shall be completed by December 30, 2022.

{¶ 4} Upon Smith's motion, the court extended the deadline for "expert reporting" to December 15, 2022. Upon motions by the railroad, it extended the railroad's "expert disclosure deadline" to February 13, 2023, and then again to February 28, 2023.

2.

**{¶ 5}** Although the record does not reflect any further extensions for disclosing his experts, Smith filed his expert disclosure on January 31, 2023, identifying biomechanics expert, Lloyd R. Wade, Ph.D., and treating physicians, Scott Ciaccia, D.O. and Laurie Ann Rousseau, D.O. The disclosure indicated that Dr. Wade would testify regarding liability and his report would be provided when available. It indicated that Drs. Ciaccia and Rousseau were both treating physicians who would testify regarding liability and causation and reminded that their "chart[s] ha[d] been provided to Defendant."

**{¶ 6}** On February 28, 2023, Smith moved to vacate the civil trial order and extend the deadlines for completing expert discovery and filing dispositive motions. That same day, the railroad filed (1) its expert disclosure, attaching their experts' reports as exhibits; (2) an opposition to Smith's motion to vacate; and (3) a motion for summary judgment.

**{¶ 7}** Both the railroad's opposition to the motion to vacate and its motion for summary judgment were premised on Smith's failure to provide reports from his expert witnesses. Its summary-judgment motion alleged that expert testimony was required to prove Smith's claims, and Smith had failed to provide his experts' reports despite passage of the deadline for doing so. The railroad offered its own experts' opinions that (1) Smith's carpal tunnel syndrome was attributable to comorbidities, including elevated body mass, age, and long-standing diabetes, and (2) Smith's job duties did not increase the risk for developing carpal tunnel syndrome.

**{¶ 8}** Smith replied that he had not been able to comply with the expert deadlines because Dr. Wade was experiencing a family illness and the treating physicians refused to provide further reports. He maintained that because the Ohio saving statute was

3.

unavailable to him—thus there was no option to voluntarily dismiss and refile—equity required that a continuance be granted. Smith also moved for a continuance to respond to the railroad's motion for summary judgment under Civ.R. 56(F).

{¶ 9} The trial court granted Smith's motion to vacate, and a new civil trial order was issued. The order set a new deadline for dispositive motions. With respect to expert witnesses, it provided:

> **EXPERT WITNESSES**: Each counsel shall exchange with all other counsel, medical and expert witnesses expected to testify in advance of Trial. Plaintiff expert disclosure with reports shall be completed by October 9, 2023. Defendant's expert disclosure with reports shall be completed by December 1, 2023.

Dr. Wade's report was disclosed to the railroad on October 9, 2023. On February 9, 2024, the railroad filed a renewed motion for summary judgment and a motion in limine to preclude Dr. Ciaccia's testimony.

{¶ 10} As to its motion for summary judgment, the railroad acknowledged that under Civ R. 26(B)(7), "[a] witness who has provided medical . . . care may testify as an expert and offer opinions as to matters addressed in the healthcare provider's records." It maintained, however, that "[o]pinions as to the causation of Plaintiff's injuries are not addressed in the records of his healthcare providers," thus an expert report summarizing and explaining his opinions was still needed. The railroad claimed that Smith could not avoid the requirement to disclose his experts' opinions merely by characterizing the witnesses as "treating physicians" or "occurrence" witnesses. Because all deadlines for providing expert reports had passed, yet Smith had failed to disclose a report or opinions of any expert or treating physician establishing that Smith's carpal tunnel syndrome was

4.

caused, in whole in or part, by his employment for the railroad, the railroad insisted that summary judgment should be granted in its favor. It also highlighted the fact that during discovery, it propounded an interrogatory seeking Smith's experts' opinions and the bases for those opinions, to which Smith responded: "Plaintiff will supply requested information in accordance with the rules and orders of the court regarding the disclosure of witnesses."

{¶ 11} As to the motion in limine, the railroad anticipated that Smith would attempt to elicit testimony regarding medical causation from Dr. Ciaccia during his upcoming videotaped trial deposition. It contended that because Smith had failed to disclose Dr. Ciaccia's expert causation opinions and the bases for those opinions as required by the case management orders and under Ohio law, the opinions were inadmissible. As such, it argued, justice required that Smith be precluded from proceeding with the video deposition of Dr. Ciaccia. The railroad argued that preparing for and participating in the deposition would be a waste of judicial resources and would subject it to undue burden and expense.

{¶ 12} Smith sought another Civ.R. 56(F) continuance, which the railroad opposed. Smith opposed the railroad's motion in limine, claiming that neither the Ohio Civil Rules of Procedure nor the court's scheduling order required that expert reports be obtained from his treating physicians. Specifically, he argued that under Civ.R. 26(B)(7)(c) and (d), he could offer expert opinions from his treating physicians without providing an expert report. And, he pointed out, the trial court's order required expert witnesses to provide reports but did not require medical witnesses to do so. Smith

5.

maintained that the purpose for disclosing reports is to prevent prejudice and unfair surprise, and insisted that there was no prejudice or unfair surprise here because the railroad had ample opportunity to discover and cross-examine Dr. Ciaccia about any causation opinions he holds.

{¶ 13} The trial court denied Smith's Civ.R. 56(F) motion and set deadlines for Smith's opposition brief and the railroad's reply in support of its motion for summary judgment.

{¶ 14} Smith timely filed his opposition brief. He argued, substantively, that the deposition testimony of Drs. Ciaccia and Wade created genuine issues of material fact preventing summary judgment. In reply, the railroad argued again that the failure to timely disclose expert opinions prevented him from relying on Dr. Ciaccia's testimony to defeat summary judgment. It also claimed that by denying Smith's motion for a continuance, the court had precluded him from offering Dr. Ciaccia's deposition testimony to oppose the railroad's summary-judgment motion.

{¶ 15} As to the substance of Dr. Ciaccia's opinions, the railroad claimed that Dr. Ciaccia's proffered testimony failed to meet the applicable standards for admission of expert opinion evidence under Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993). It also contended that Dr. Wade's deposition testimony was inadmissible for these reasons, and it indicated that it would be filing a motion in limine to exclude Dr. Wade's opinions. It filed that motion in limine approximately three weeks later, arguing that Dr. Wade's opinions were not based on scientifically reliable principles and methodology and would not assist the jury in

6.

determining facts and evidence at issue.  Smith opposed the motion to exclude Dr. Wade's opinions.

{¶ 16} On September 10, 2024, the trial court ruled on the outstanding motions.  It granted the motions in limine to preclude Drs. Ciaccia and Wade's opinions, and it granted summary judgment to the railroad.

{¶ 17} As to the exclusion of Dr. Ciaccia's opinions, the court reasoned:

> Plaintiff has failed to disclose Dr. Ciaccia's expert causation opinions in this matter as required Ohio Civ.R. 26 and this court's order after being given multiple extensions of time.  Although Ohio Civ.R. 26(B)(7)(d) allows a treating physician to "testify as an expert and offer opinions as to matters addressed in the healthcare provider's records", Dr. Ciaccia admits that his medical records concerning Plaintiff do not address the cause of Plaintiff carpal tunnel syndrome.  As Dr. Ciaccia's preferred (sic) testimony in this matter involves testimony regarding matters not addressed in his records, this Court finds said testimony is inadmissible for failure to satisfy the requirements of Ohio Civ.R. 26(B)(7)(d).

{¶ 18} As to the exclusion of Dr. Wade's opinions, the court reasoned:

> This Court finds that Dr. Wade failed to employ a reliable scientific methodology for the assessment of the Plaintiff's workplace exposures to ergonomic risk factors for carpal tunnel syndrome.
>
> Dr. Wade failed to establish a foundational basis to make his conclusions.  For example, in Dr. Wade's deposition, Dr. Wade admitted that he only reviewed one three-page document from Norfolk Southern Railway Company; failed to conduct a comprehensive audit of Norfolk Southern Railway Company's ergonomic program or review any employee training manuals.  Dr. Wade conceded that he had no information regarding the frequency, forces and postures associated with performing the job tasks of a railroad machinist.
>
> Further, the methodology supporting Dr. Wade's causation opinion fails to meet the criteria for reliability and admissibility under Evid.R. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

{¶ 19} And as to the motion for summary judgment, the court reasoned:

7.

This Court has previously granted Defendant Norfolk Southern Railway Company's motion in limine to exclude the Expert Report and Testimony of Lloyd R. Wade, Ph.D. as well as [to] exclude the Testimony of Dr. Scott Ciaccia for the reasons stated in said Orders.

Therefore, this Court finds that Plaintiff has failed to properly disclose the report and/or opinions of any expert or treating physician establishing that Plaintiff's alleged carpal tunnel syndrome is caused, [in] whole or in part, by his employment for Defendant Norfolk Southern Railway Company. Therefore, this Court finds that there is insufficient evidence to create a genuine issue of material fact as to Defendant's liability and summary judgment is appropriate in favor of Defendant.

{¶ 20} Smith appealed and assigns the following errors for our review:

1. The trial court abused its discretion by excluding the causation testimony of Dr. Scott Ciaccia for failing to provide an expert report where Dr. Ciaccia's complete chart had been produced.

2. The trial court abused its discretion by excluding the testimony of Dr. Lloyd "Chip" Wade on the basis of Evid.R. 702 and Daubert.

3. The trial court erred by granting the Defendant's motion for summary judgment.

## II. Standard of Review

{¶ 21} As to the trial court's decisions excluding Drs. Ciaccia and Wade's opinions, "the determination of the admissibility of expert testimony is within the discretion of the trial court" and will not be reversed absent an abuse of discretion. *Valentine v. Conrad,* 2006-Ohio-3561, ¶ 9, citing Evid.R. 104(A). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 2019-Ohio-223, ¶ 13 (10th Dist.). "An arbitrary decision is one that lacks adequate

8.

determining principle and is not governed by any fixed rules or standard." *Id.* quoting

*Porter, Wright, Morris & Arthur, LLP v. Frutta del Mondo, Ltd.*, 2008-Ohio-3567, ¶ 11

(10th Dist.). And an unconscionable decision is one "that affronts the sense of justice,

decency, or reasonableness." *Id.* "A trial court will [also] be found to have abused its

discretion when its decision is contrary to law, unreasonable, not supported by the

evidence, or grossly unsound." *State v. Nisley*, 2014-Ohio-981, ¶ 15 (3d Dist.), *State v.*

*Boles,* 2010-Ohio-278, ¶ 16-18 (2d Dist.).

{¶ 22} As for the trial court's decision granting summary judgment in favor of the

railroad, appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison*

*Co.,* 77 Ohio St.3d 102, 105 (1996), employing the same standard as trial courts. *Lorain*

*Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129 (9th Dist. 1989). The motion may

be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 23} When seeking summary judgment, a party must specifically delineate the

basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988),

syllabus, and identify those portions of the record that demonstrate the absence of a

genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). When a

properly supported motion for summary judgment is made, an adverse party may not rest

on mere allegations or denials in the pleadings, but must respond with specific facts

9.

showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304 (6th Dist. 1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826 (8th Dist. 1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### III. Law and Analysis

{¶ 24} Smith assigns error in the trial court's decision granting the railroad's motions to exclude opinions from Dr. Ciaccia, Smith's treating physician, and Dr. Wade, an ergonomist and biomechanics expert retained by Smith. Smith had relied on these witnesses to establish both liability and causation. Smith also assigns error in the trial court's decision granting summary judgment in favor of the railroad insofar as that decision was premised on the allegedly-improper exclusion of the opinions of his expert witnesses.

### A. Exclusion of Dr. Ciaccia's Opinions

{¶ 25} The trial court granted the railroad's motion to exclude opinions from Dr. Ciaccia on the basis that Dr. Ciaccia's proffered testimony "involves testimony regarding matters not addressed in his records." In his first assignment of error, Smith argues that this was error. He maintains that by its plain language, Civ.R. 26(B)(7)(c) permits a treating healthcare provider to offer opinions *as to matters addressed* in his records without having to provide an expert report—it does not require the opinions themselves to be contained within the records, as advocated by the railroad. We agree with Smith.

10.

{¶ 26} Civ.R. 26(B)(7) was overhauled in 2020 to include the provisions applicable to this issue. Under Civ.R. 26(B)(7)(c), "[o]ther than under subsection (d)," an expert witness may not testify or provide opinions unless he or she provides a report disclosing "a complete statement of all opinions and the basis and reasons for them as to each matter on which the expert will testify." Under Civ.R. 26(B)(7)(d), however, a treating physician "may testify as an expert and offer opinions as to matters addressed in the healthcare provider's records." Those records "shall be provided to opposing counsel in lieu of an expert report in accordance with the time schedule established by the Court."

{¶ 27} No Ohio appellate court has interpreted this rule as amended, but under the plain language of the rule, unlike an expert report, which must contain the experts' "opinions" along with the "basis" for those opinions, the health care records of a treating physician who is disclosed as an expert need only "address" the "matters" about which the provider will offer opinions. There is nothing in this rule that requires the opinions themselves to be set forth in the health care records.

{¶ 28} Here, it is not disputed that Smith's pertinent medical records were timely provided to the railroad. Those records "address" the diagnosis and treatment of Smith's carpal tunnel syndrome, and they also allude to a potential cause for Smith's condition:

> The patient presents today for evaluation of his bilateral upper extremities. He describes numbness and tingling on a daily basis. This is clearly worse in the workplace. *He works as a machinist. He uses some type of an impact gun that causes repetitive vibration to the hands.* This bothers him immensely. He has had ongoing symptoms on and off for years of numbness and tingling. He describes symptoms on the left that are equal to those on the right. He has numbness and tingling involving the radial three digits to the bilateral hands. He has symptoms that wake him

11.

from sleep at nighttime. He has functional issues during the day. He presents today for evaluation and treatment. (Emphasis added.)

The contents of Dr. Ciaccia's records sufficiently "address" the "matters" about which he offered opinions.

{¶ 29} As previously stated, we review a decision admitting or excluding expert witness testimony under an abuse-of-discretion standard. *Akron Bar Assn. v. Shenise,* 2015-Ohio-1548, ¶ 13. "A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound." *Nisley,* 2014-Ohio-981, at ¶ 15 (3d Dist.), *Boles,* 2010-Ohio-278, at ¶ 16-18 (2d Dist.). Given that Smith's disclosures complied with the requirements of Civ.R. 26(B)(7)(c) and (d), we conclude that the trial court abused its discretion—and acted contrary to law—when it excluded Dr. Ciaccia's opinions on the basis that he testified regarding matters not addressed in his records.

{¶ 30} In addition to arguing that Dr. Ciaccia's opinions were inadmissible because Smith failed to timely disclose them, the railroad also argues that Dr. Ciaccia's proffered testimony, even if admissible, does not create a jury question because his deposition testimony made clear that he could not say with any degree of medical certainty that Smith's railroad employment caused his injuries.

{¶ 31} First, this was not the basis for the railroad's motion to exclude Dr. Ciaccia's opinions in the trial court, thus we need not consider it. *See Ohio Edison Co. v. Franklin Paper Co.,* 18 Ohio St.3d 15, 18 (1985), fn. 2 (declining to consider appellee's argument raised on appeal because it was not raised in its motion in the trial court).

12.

Second, this court has recognized that while "[m]edical testimony evidence in a FELA case must have some reasonable basis and have some degree of certainty," an expert "does not need to testify to a reasonable degree of medical certainty in order to be admissible." *Taylor v. Norfolk Southern Ry. Co.*, 2020-Ohio-2657, ¶ 21 (6th Dist.). *See also Steveson v. CSX Transp., Inc.*, 91 F.3d 144 (6th Cir. 1996) ("[B]ecause of the relaxed standards applied in FELA and Jones Act suits, a medical expert need not be able to articulate to a 'reasonable degree of medical certainty' that the defendant's negligence caused the plaintiff's injury."). Third, Dr. Ciaccia *did* provide causation opinions to a reasonable degree of medical certainty.

{¶ 32} Dr. Ciaccia testified that Smith was a "hands-on grip squeezing kind of guy, running tools and pneumatic gun (sic)[.]" He recalled that Smith worked as a machinist and used an impact gun, causing repetitive vibration to the hands. Dr. Ciaccia testified that "those who do engage in repetitive gripping have a higher incidence rate of carpal tunnel[,] [a]nd specifically, the vibratory stuff is an absolute irritant." He said that "for a guy who sees a fair bit of carpal tunnel to say the least, it is a pretty classic presentation that [Smith] had," and he "felt like he knew what [he was] dealing with." He confirmed that all his opinions were provided to a reasonable degree of medical certainty.

{¶ 33} Counsel for the railroad sought to challenge Dr. Ciaccia's opinions concerning the cause of Smith's carpal tunnel syndrome. Counsel asked if his medical records stated that Smith's injuries were caused by his job. Dr. Ciaccia asked: "Do I state that it caused his carpal tunnel syndrome? No. Do I believe it did? Yes." Dr. Ciaccia acknowledged that obesity can contribute to the development of carpal tunnel

syndrome, but he countered that while Smith is overweight, "it's the activities in the workplace that are making his symptoms severely worse."

{¶ 34} In *Henry v. CSX Transp., Inc.,* 2012 WL 1365649, *9 (S.D.Ohio Apr. 19, 2012), the plaintiff's medical expert opined that his bilateral carpal tunnel syndrome was related to his work with the railroad. The doctor explained:

> Patient has been employed many years on the railroad. Has been very physical in his nature of work which also requires repetitive motions of the hand and wrists. He also has included the use of a jackhammer at times and with this long extensive history and numbness and tingling of his hands, I strongly feel that this is directly related to his course of employment.

The district court observed that "the FELA imposes a relaxed standard of proof with respect to the element of causation," and it found this statement sufficient to support causation. *Id.*

{¶ 35} Dr. Ciaccia articulated opinions substantially similar to those expressed by the medical expert in *Henry.* Moreover, Dr. Ciaccia confirmed that he held his opinions to a reasonable degree of medical certainty. His causation opinions were sufficient to meet the standard of proof with respect to the element of causation.

{¶ 36} We find Smith's first assignment of error well-taken.

### B. Exclusion of Dr. Wade's Opinions

{¶ 37} In his second assignment of error, Smith argues that the trial court erred when it granted the railroad's motion in limine to preclude it from offering opinions from his retained ergonomics expert, Dr. Wade. He claims that the trial court's criticisms of Dr. Wade's opinions—that they lacked a foundational basis, that he did not conduct a

14.

comprehensive audit of the railroad's ergonomic program or review any employee training manuals, and that he lacked information regarding the frequency, forces and postures associated with the railroad machinist job—do not affect the reliability of Dr. Wade's opinions. Rather, he maintains, they go to the weight of his opinions. Smith contends that Dr. Wade's opinions rest on sound scientific methodology and his conclusions reliably rest on known and observable data. He argues that in concluding otherwise, the trial court exceeded its role as gatekeeper and abused its discretion.

{¶ 38} The railroad responds that the methodology supporting Dr. Wade's opinions does not meet the criteria for reliability and admissibility under Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). It complains that he failed to utilize a proper scientific method, lacked a factual basis for his opinions, and did not perform an acceptable methodology in reaching conclusions.

{¶ 39} Before considering the parties' arguments concerning the admissibility of Dr. Wade's opinions, we briefly summarize the deposition testimony of Smith and Dr. Wade.

### 1. The Deposition Testimony

### a. Smith

{¶ 40} Smith testified that his carpal tunnel syndrome developed over time. He first noticed the symptoms at the end of 2018, or beginning of 2019. His hands would throb and become completely numb and his fingers would tingle. This happened consistently when working with air guns, air ratchets, air impacts, and any other tool that vibrated his hands. When he stopped using the gun, this feeling would last for an hour-

and-a-half to two hours, but would come back at night when he tried to sleep. Smith did not know what the feeling was at first—he thought it was fatigue. Smith's supervisor told him it was carpal tunnel, but he also told Smith that he could either do his work or find another job. Eventually, the situation became so bad that Smith went to Dr. Ciaccia, a hand surgeon.

{¶ 41} Smith's employment with the railroad began in 1997. He became a welding instructor in 2010, as part of a federally-mandated program, but the railroad stopped this program because it did not have sufficient personnel to work on locomotives. He returned to the yard in 2017. "Yard work," he explained, meant answering service calls to work on locomotives. Because of massive layoffs, the locomotives were kept in the yard and serviced there instead of being brought into "the pit." Smith explained the different tasks he performed, both as a welding instructor and as a yard worker, and he described the various tools he used to perform those tasks.

{¶ 42} Between 2017 and 2019, welding instruction comprised about 25 percent of Smith's time. After 2020, he performed some, but very little, welding instruction. As a welding instructor, Smith taught out-of-position welds and in-position welds. He explained that out-of-position welds are performed in an overhead, vertical position, whereas in-position welds are performed flat. At first, students received one week of welding training, but with personnel shortages, it was reduced to one day so they could get workers back on the floor.

{¶ 43} As a welding instructor, Smith used a Bantam Bully, which is an air chisel that runs pneumatically and is used to get the slag out of a weld to strengthen it. He also

16.

used a scaler for this task and an air hand tool to clean welds and to remove carbon on the exhaust assemblies. The Bantam Bully was more efficient and powerful than a scaler, fits in the palm of the hand, and weighs very little. He held it in his right hand and would move it up and down along the path of the weld. As a welding instructor he used the air chisel and scalers every day, usually for a minute at a time over the length of the weld. The number of times he used this tool depended on the number of students he was instructing.

{¶ 44} On the floor or in the shop, Smith performed the normal duties of a machinist. He would remove power assemblies, change brake shoes, break down equipment, brake riggings, and air boxes, and repair wrecks. Smith said that there was not much downtime during the day because if he was waiting on parts for one job, he was expected to work on the next job. He got a ten-minute break at 9:00 a.m. and a 20-minute lunch.

{¶ 45} A spline gun, which vibrated and caused problems to his hands, was used to remove crab bolts from a power assembly. It would usually take a continuous five minutes to remove one bolt. There are four bolts. The entire process of removing a power assembly varied, but he estimated a half day. He had to do this several times a month, whenever they came in and needed to be repaired.

{¶ 46} Air wrenches were used to remove air boxes and also caused him symptoms. Removing the air box was the first step in removing the power assembly. He used the tool to remove clamping and break bolts. He had to remove snap rings, the air box, crabs, "and everything."

17.

{¶ 47} Air impacts were used to remove fasteners on a unit—i.e., nuts and bolts. The amount of time it takes to remove a nut varies; sometimes they would be locked in and this would take more time. He couldn't say how many nuts and bolts needed to be removed from a power assembly, but it could take half a day to remove them. In a normal situation, he would have to use the tool half the time, but there were times he would be using the tool almost all the time.

{¶ 48} Removing break rigging required him to "cut the trucks out," take the air off, and remove the brake shoe, the key, and a pin in the back. He would have to knock the pin off the back with air then do the same with the front. These were laid on boards on a raised rail track, above floor level in a pit. He described cutting air valves out, which required "turning an angle cock." In removing brake shoes, he would have to remove the pin, knock the brake shoe back, reach "way up in," knock the key out—which, he said, never comes out easily—then pull the brake shoe off. The key is knocked out with a miniature sledgehammer that weighs around two pounds and can be performed in less than a couple of minutes. "Two giant nuts" had to be removed from the brake rigging and the brake arm with air tools. Some were easy to remove, some were difficult, so the time it took to do this varied. Easy ones took around one to two minutes. For more difficult ones, he would work on them for as long as two days before just deciding to cut them off. He described that use of the tool was not necessarily constant—"you'd take heat, put it on the nut, use an impact. Heat on the nut, impact, and this went on, and if [he] didn't get it done, it'd go to the next shift." Often the next shift would skip the unit, so it would be there for Smith again when he returned. The air impact was the main

18.

tool used to get the nuts off. He could not provide an accurate estimate of how much time he would use the air impact.

{¶ 49} Smith described the process of removing brake rigging, which involved tools that caused pain to his hands. A unit would be derailed and he would have to get underneath it and weld the gear case cover up and put it all back. If they didn't have the brake rigging in stock, he would straighten out the brake rigging. He would have to replace the brake hanger bushings, which hold the brake shoe. The hanger has a big pin with other pins in it, which would have to be torn apart. It would twist around, so he'd have to remove and straighten them because they didn't keep them in stock. This was done in the case of derailment, which didn't happen a lot but seemed to happen more after layoffs.

{¶ 50} If the pilot on a wrecked train was damaged, Smith would use air tools to weld it. He would air arc the crack out, weld the braces on the back, and use an air chisel to get the slag out. This required use of the Bantam Bully. If the stairs were crushed and he couldn't get a torch in, he would use an air tool to remove the nuts to remove the staircase. The air tools are used to take things apart or put things back together. No air tools were used for welding except that the Bantam Bully needed to be used on each weld. Some of the welds were five or six feet tall. He couldn't say how long he would use the Bantam Bully in these situations except to say that a wreck could take one to two weeks to repair. The length of time he would use the air tools varied. To remove the slag from one weld takes three or four minutes. To make a weld could take up to 45 minutes, depending on the length of the crack and the thickness of the material.

19.

{¶ 51} During the last three years of his employment, Smith worked on derailed locomotives quite a bit—at least monthly. Brake rigging would most commonly need to be repaired on a derailed locomotive, so the brake rigging needed to be removed. A laborer would occasionally be assigned to help him. The laborer would hold a big giant wrench against the rail so it wouldn't fly off and they would get new parts if they were in stock. If the parts weren't in stock, they would either wait for the part or repair the broken part. The laborers did not use air tools.

{¶ 52} Smith described that he worked on the drop table, using air tools to remove brake rigging to drop traction motors. He worked on the wheel cutting machine which used air tools to pull the centers and caps off to put hydraulic centers in to lift the locomotive up to cut the wheels. There was a drop bar for the bearing housings for the traction motor, holding them in place. He had to take two big nuts off of the bar and swing it out of place to bring the traction motor down out of the spring packs. This took approximately ten to 15 minutes. The frequency of this task varied. It took about 30 minutes to remove wheel centers with three-quarter inch impact guns. There were six or eight circular bolts, an inch-and-a-quarter or an inch-and-an-eighth. He would have to take those out, flip the wheel cover up, put another bolt in to hold it up, and then put the hydraulic center in. The center would go in and it would lift the locomotive so he could cut the wheels. He would have to do this on both sides. He would have to adjust the wheel sets in the truing machine using big hammers and wrenches. It took a half-hour to 45 minutes per wheel to adjust the wheel sets on the machine. To cut the wheel with the machine would take one to three hours, depending on how much had to come off the

20.

wheel. Once the machine was set up, it just involved pressing a button, but the machine needed to be adjusted to each wheel.

{¶ 53} Smith feels that the air guns contributed to his carpal tunnel. He's always used air guns, but did not start feeling symptoms until 2017, when he started working on the floor. The pain started in his pinkies and ring fingers and spread to his hands. He experienced tingling. His hands eventually became numb. He went to Dr. Ciaccia in May of 2020. He had injections at first, but eventually proceeded to surgery. Smith is diabetic and was on weight loss pills for three months. He is five feet, eight inches and 246 pounds. After the surgery, he went back to work for some time, but he did not want to do the work because he lacked hand strength.

{¶ 54} As to the railroad's commitment to safety, Smith does not believe that safety was an important issue for the railroad. There were quotas on the number of locomotives that needed to leave the shop. Supervisors received bonuses based on how many units they got out. If quotas weren't met, the supervisors were not happy. Workers were pressured to make repairs quickly and told to go "faster, faster." They would be asked "what's taking so long?" Because of the pressure on the supervisors to get units out, it was impossible to follow all the rules, and supervisors "looked the other way." There was not sufficient personnel, so the railroad mandated overtime, usually eight hours, so they could get the required number of locomotives out of the shop.

{¶ 55} Smith said that he was trained to do his job safely—he watched safety films and went to safety classes—but he denied that he received ergonomics training. He was trained to work within his capacity and not to overexert, but claimed that "they did away

21.

with the safety program." Although they were trained to request assistance when needed, there was never the personnel for assistance. The railroad provided personal protective equipment, including gloves, but they did not provide anti-vibration gloves. In fact, Smith did not even know they made anti-vibration gloves.

{¶ 56} Smith described several situations where he complained to supervisors about safety-related issues. He was doing an air change on his shoulder and he told his supervisor that his shoulder was bothering him. The supervisor asked if he needed to go to the hospital, and he said no. The supervisor told Smith it was his job to keep Smith working. Smith complained that Track 4 was not designed for performing air changes and he could not lay on his back and lift 70 pounds, but his supervisor refused to help. This happened near the end of his employment. He complained that two-man jobs became one-man jobs. Another instance occurred toward the end of Smith's employment, after the railroad laid off many workers and had inadequate personnel. He was expected to work on top of a locomotive to change a leaking radiator. He complained to a supervisor that he couldn't do it because he couldn't feel his hands. He was told to do it or go home. He almost fell off the locomotive. Another time he was told to get on the locomotive, but he almost fell off the rungs because his hands were numb, so the supervisor gave him a different job.

{¶ 57} Smith testified that he was furloughed in the fall of 2020, due to a reduction in force and went on disability in May or June of 2021, because of shoulder problems and a lack of hand strength. He confirmed that his claim in this case is limited to his carpal tunnel syndrome.

22.

**b. Dr. Wade**

{¶ 58} Dr. Wade is an ergonomist and a biomechanist. He has an undergraduate degree in risk management and insurance, a master's degree in biomechanics and human movement, a post-doctorate degree in biomechanics, and Ph.Ds. in biomechanics and finance. Although he has published numerous papers, Dr. Wade confirmed that he would not be relying on any of his own peer-reviewed publications or presentations in support of his opinions. He conceded that none of his research has focused on the use of hand tools, carpal tunnel, or the work of railroad shop employees.

{¶ 59} When Dr. Wade looks at a job as part of his research or to assess a job for the presence of ergonomic risk factors, he takes into account human factors, environmental factors, and work factors, does a personal assessment or a demographic assessment of the workers, and then does a biomechanical assessment of the job tasks. He explained that the job tasks can be repetitive jobs or single-use jobs. In performing a demographic assessment, he looks at personal factors, such as height, weight, medical issues, anthropometrics, work histories, and other things that relate to the individual from a human standpoint. When he does biomechanical assessments, he tries to mimic an environmental situation and watch an individual conduct activities in that environment as he measures biomechanical factors, forces, muscle activity, and kinematics. But observation isn't always feasible, so he relies on historical or similar observations in the literature, previous assessments, direct recall from an individual, or historic evaluations of how people walk, move, lift, or lower a hand tool.

23.

{¶ 60} When he writes a publication, Dr. Wade usually goes out and looks at the work and quantifies exposures when available by evaluating and assessing types of anatomical movements, joint positions, forces, movement profiles, and repetition. He uses software to look at joint mechanics, forces, and activities, and may digitize motion. What he does depends on the accessibility of the activity in the workforce. He may use more than one assessment tool depending on the situation, but he disagreed that using more assessment tools provides more accurate data.

{¶ 61} When he publishes literature, Dr. Wade explained that he conducts lab studies where the environment is controlled and he has the ability to collect as much data as he wants. When he can't directly observe the environment, he is more limited in the type of assessment he can perform, so in that situation, RULA (Rapid Upper Limb Assessment) is effective for assessing upper extremity musculoskeletal risk. Here, he could not observe Smith's work because he is not actively working, and he did not rely specifically on Smith's performance of the activities, but rather evaluated the activities as a whole.

{¶ 62} Usually in researching ergonomic risk factors Dr. Wade would review documents, including documents describing work-specific task instructions, training videos, training documents, peer-reviewed publications, academic information, and NIOSH literature about the task. Often, however, he relies on self-reporting, including interviews with workers about what they do and how they do it.

24.

{¶ 63} Litigation consulting comprises the vast majority of Dr. Wade's work. He also teaches, performs research, and does other consulting sporadically. He has done assessments for carpal tunnel cases, but has never testified in a carpal tunnel case.

{¶ 64} In this case, Dr. Wade reviewed the complaint, depositions, interrogatories, some of the railroad's ergonomic documents, and a medical summary. The ergonomic assessment was a three-page document. It was the only document he reviewed from the railroad. None of the articles or texts he read in connection with this case address the biomechanics of railroad work.

{¶ 65} Here, Dr. Wade looked at tasks associated with tools, postures, and forces that a machinist or welder would be exposed to. He looked specifically at the use of two types of tools—the spline gun and the Bantam Bully—under RULA. He recalled that Smith's use of these tools varied, but they were often used to remove crab nuts, for instance. He spoke with Smith for about 90 minutes and discussed his deposition. Dr. Wade's understanding was that the Bantam Bully is a vibrating scraping tool used to clean. He didn't quantify how often Smith used this tool in terms of hours, but considered it a general use item used in his trade. His understanding was that the tool was used daily. Dr. Wade looked up the size and weight of the Bantam Bully and spline gun, but did not document when he did this and did not save the websites. He said the spline gun ranges from one pound to two-and-a-half pounds. The weight of the Bantam Bully depends on which chipper or chisel is attached, but the weight is generally one pound to two-and-a-half pounds. He picked tasks requiring these tools because as discussed at Smith's deposition, these tools were commonly used.

25.

{¶ 66} As part of his methodology, Dr. Wade first screened for ergonomic factors based on scientific literature and his knowledge of ergonomics. He looked at the type of tool, the type of posture that an individual would have to use to operate the tool, and ergonomic risk factors for grip, repetition, force, weight, and load carriage. A typical ergonomic assessment requires looking at both the work factors as well as the human factors and environmental factors that contribute to effective use of a tool, including the posture an individual would maintain, how an individual would hold a tool, and how an individual would depress an activation button grip.

{¶ 67} Smith's postures varied depending on whether he was standing or kneeling or whether he was in a confined space or not, so Dr. Wade assumed a standing position during use of the tools—he did not look at bent postures. He looked at hand postures, which varied based on where the nuts were positioned. This would affect upper extremity postures in terms of shoulder extension and flexion and elbow extension and flexion. Wrist postures would vary based on the gun posture. Dr. Wade took a conservative approach in these assessments and used a neutral posture as opposed to deviated postures at the wrist or shoulders. He didn't have access to the spline gun or Bantam Bully so he did not measure force. He did not watch videos of the use of the tools, although he has seen the Bantam Bully in use before.

{¶ 68} The second part of Dr. Wade's methodology was observational analysis. Because he did not have direct access to the tools or the ability to observe their on-site use, he assumed neutral postures and did not evaluate deviated postures. If he had evaluated with deviated postures, the RULA score would have increased.

26.

{¶ 69} In his report, Dr. Wade stated that "understanding the job task performed by Mr. Smith was obtained from his deposition and interview, literature presented by Purswell and Woldstad and others, and exposure to trackmen working at other locations throughout the country." He described that "[a] determination of the presence of ergonomic risk [was] completed through systematic observations at site inspections combined with other collected information about Mr. Smith's job." Dr. Wade acknowledged that Purswell and Woldstad—published in 1991—studied trackmen, not shop employees, and trackmen don't use a spline gun or Bantam Bully.

{¶ 70} Dr. Wade evaluated general hand postures used in operating battery-powered pneumatic or electrical tools. He didn't specifically consider tools other than the spline gun and Bantam Bully. He has never prepared an expert report involving these specific tools. He stated in his report that use of the spline gun and Bantam Bully is similar to the tools used in Purswell and Woldstad. While trackmen work at ground level, Dr. Wade acknowledged that machinists and welders often work at chest or waist level. Dr. Wade emphasized, however, that this doesn't change the hand posture. He also acknowledged that Purswell and Woldstad was an observational study and not an ergonomic assessment. He agreed that there has been no study on the risk of carpal tunnel for machinists and welders.

{¶ 71} The third part of Dr. Wade's methodology involved biomechanical analysis. This was the RULA assessment. This is the only assessment tool he used. He acknowledged that this test hasn't been validated specific to any job classification, but he explained that it has been validated as a research tool. He said it is the most widely used

27.

upper limb assessment tool in the literature.  Use of the tool leads to a quantitative score indicating whether there is actionable risk involved in a task, but it is not a cause-and-effect assessment.  It is a postural analysis.

{¶ 72} Dr. Wade's assessment is based on neutral posture and neutral muscle use and forces based on the weight of the tools.  His use of RULA for assessing the spline gun and Bantam Buddy indicate actionable levels that must be examined in terms of work assessment and change—it identifies an at-risk or elevated risk posture and activity.  It is not specific to carpal tunnel, but rather to upper extremity musculoskeletal disorders generally.  He acknowledged that posture alone, like obesity, is not the only cause of carpal tunnel.

{¶ 73} Again, Dr. Wade's assessment does not assume deviated postures.  If he assumed deviated postures, the RULA score would go up.  Dr. Wade acknowledged that RULA doesn't take into account frequency and that it is just one part of a comprehensive ergonomic assessment.  He used the weight of the tools as a muscle use and force multiplier here.  He assumed that posture was mainly static and held for more than one minute or four times per minute, even though he didn't have information indicating that this was the length of time Smith used these tools.  He also assumed that Smith worked on an unstable foot floor, like ballast.  This was based on Dr. Wade's exposure to shops historically, anecdotal evidence, and time spent at different sites, but this was a neutral, low-factored issue and a conservative approach to the type of foot-floor interface Smith would have worked on.  Dr. Wade acknowledged that Smith used the spline gun in variable locations.

28.

{¶ 74} Dr. Wade agreed that objective measures would be superior to a subjective presentation that an employee may give. He did not do a comprehensive review of the railroad's health, safety, and ergonomic efforts because he did not have access to this information.

## 2. Admissibility of Dr. Wade's Opinions

{¶ 75} Under Evid.R. 702, a witness may testify as an expert if all the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

{¶ 76} Ohio courts rely on the U.S. Supreme Court's decision in *Daubert* in evaluating the reliability of scientific evidence. There the Court set forth the following factors to be considered to aid in determining whether the scientific evidence is reliable: "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607, 611-12 (1998), citing *Daubert* at 593-594. But both the U.S. and Ohio Supreme Courts recognize that "the inquiry is flexible." *Id.,* citing *Daubert* at 594. And they

29.

emphasize that "[t]he focus is 'solely on principles and methodology, not on the conclusions that they generate.'" *Id.,* quoting *Daubert* at 595.

{¶ 77} It is undisputed that in this case, Dr. Wade applied RULA to screen for the identification of biomechanical risk factors of the upper extremity. The railroad does not actually challenge any of the *Daubert* factors as to the reliability of this assessment modality, in general. Rather, it argues that Dr. Wade has no knowledge of the underlying facts necessary to properly perform a RULA screening, and it challenges application of this screening for assessing risk for carpal tunnel. It also claims that Dr. Wade deviated from the proper methodology, therefore, producing inaccurate results, and his opinions are not based on "good grounds" based on what was known to him.

{¶ 78} The Ohio Supreme Court recognized in *Valentine v. Conrad,* 2006-Ohio-3561, ¶ 18, that Evid.R. 702(C) requires not only that the underlying data and research upon which an expert bases his or her opinions are scientifically valid, "but also that they support the opinion." It cautioned that while "scientists certainly may draw inferences from a body of work, trial courts must ensure that any such extrapolation accords with scientific principles and methods." *Id.* If "'there is simply too great an analytical gap between the data and the opinion proffered,'" the expert's opinions should be excluded as unreliable. *Id.,* quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

{¶ 79} Moreover, in addition to assessing the reliability of the methodology, a trial court's gatekeeping function "requires it to judge whether an expert's testimony is relevant to the task at hand in that it logically advances a material aspect of the proposing party's case." (Internal quotations omitted.) *Terry v. Caputo,* 2007-Ohio-5023, ¶ 26, 30.

citing *Valentine v. PPG Industries, Inc.*, 2004-Ohio-4521, ¶ 30 (4th Dist.), quoting *Daubert* at 597.  This means that there must be a connection between the scientific research or test result and the facts at issue.  *Id.*

{¶ 80} As to the absence of a factual basis for his opinion, the railroad claims that Dr. Wade admitted that he had no information about the frequency of Smith's work exposures, the forces involved in the performance of his job tasks, and the hand postures assumed by Smith when performing his job tasks, yet he concluded that Smith was subjected to high force, high repetition, and awkward postures during the course of his work.  It also argues that Dr. Wade criticized the railroad's ergonomic efforts and opined as to what the railroad knew or should have known even though he did not know what ergonomic training was provided to Smith, and he did not conduct a comprehensive audit of the railroad's safety and ergonomic efforts.  Related to this, the railroad is critical that Dr. Wade relied on Smith's own description of his job duties instead of using objective data, which he admitted would be more reliable.

{¶ 81} Although framed as an Evid.R. 702 argument, this is really an issue governed by Evid.R. 703 and 705.  Evid.R. 703 specifically provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing."  Evid.R. 705 permits the expert to "testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data.  The disclosure may be in response to a hypothetical question or otherwise."  "As long as evidence admissible at trial is introduced and admitted through fact witnesses with personal knowledge, an

31.

expert witness without personal knowledge of the underlying event is permitted to testify to an opinion based on admitted facts." *Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec., Inc.,* 110 Ohio App.3d 732, 738 (2d Dist. 1996). "In other words, experts may opine based upon predicate facts otherwise admissible in evidence under Evid.R. 703." *Id.*

{¶ 82} Here, it was appropriate for Dr. Wade to offer opinions based on Smith's description of his job duties. *See Taylor v. Norfolk Southern Ry. Co.,* 2020-Ohio-2657, ¶ 99 (6th Dist.) (Mayle, J. concurring), citing *Warner v. DMAX Ltd., LLC*, 2015-Ohio-4406, ¶ 17 (2d Dist.) (Expert's "opinion was admissible even though the expert did not have any information about plaintiff's job duties other than information that the plaintiff provided herself."). Dr. Wade was not required to actually watch those duties being performed. Although Smith was often unable to describe how long he used any particular tool at a given time, he explained what he did with the tools, gave some testimony about the frequency of the use of the tools, and described the environment in which these tools were used. Smith's descriptions of his use of these tools provided insight about the postures, repetition, and force required. Dr. Wade simply used the most conservative *possible* postures in performing the RULA analysis. In his words, he used "a neutral posture application *of a specific tool or cast*" as opposed to a deviated posture. (Emphasis added.) Clearly, it was not physically possible for Smith to assume an absolutely neutral position in handling the tools and performing the tasks he described— no tool can be used with one's arms at their side and without any extension of the arms or engagement of the wrists.

32.

{¶ 83} As to the railroad's ergonomic efforts and Dr. Wade's opinions as to what the railroad knew or should have known, it appears that there was disparity between the safety measures as they existed on paper and the safety measures as applied on a day-to-day basis. Smith described that he received no ergonomic training and over the last several years of his employment, unreasonable speed, long hours, inadequate manpower, and excessive overtime plagued the railroad workers and overshadowed anything that may have been in print in the railroad's written policies, procedures, or training manuals. Dr. Wade's failure to review all those materials does not render his opinions inadmissible.

{¶ 84} "'Weaknesses in the factual bases of an expert's testimony go to the weight and credibility of the expert's testimony, not to its admissibility.'" *Taylor* at ¶ 98 (Mayle, J. concurring), quoting *Dejaiffe v. KeyBank USA Natl. Assn.*, 2006-Ohio-2919, ¶ 19 (6th Dist.). "The absence of certain facts, or the failure of proof of others, goes to the weight and credibility of the [expert] testimony, and not to its admissibility. The burden falls on the opposing party to discredit or minimize the expert's testimony through cross-examination, just as defense counsel attempted to do in this case." *Johnson v. Knipp*, 36 Ohio App.2d 218, 220 (9th Dist. 1973). The "deficiencies" pointed out by the railroad are fodder for cross-examination; they do not render Dr. Wade's opinions inadmissible.

{¶ 85} Turning to the methodology used, the railroad questions the appropriateness of Dr. Wade's use of RULA here, and it maintains that while Dr. Wade claimed to use a RULA analysis, he analyzed only two of the tools Smith used in performing his job duties. It complains that Dr. Wade assumed that Smith maintained neutral postures and that his muscle use and force multipliers were minimal, but it claims

33.

that if Dr. Wade had actually made these assumptions in performing his analysis, his conclusions would have been different. The railroad also criticizes Dr. Wade for conducting internet research without documenting what he looked at and when he looked at it. The railroad contends that Dr. Wade's methods were litigation-driven and that he failed to employ the same methodology that he uses when he conducts research, writes peer-reviewed publications, and performs private consulting for companies. And the railroad faults Dr. Wade because he cited publications that are more than 30 years old, cited no publications involving examination of railroad welding and machining, and identified no publications linking carpal tunnel to welding and machining.

{¶ 86} In determining whether an expert's opinion is reliable, the court must focus on whether the principles and methods employed by the expert to reach his opinion are reliable—"not whether his conclusions are correct." *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607, 611 (1998). *See also Valentine v. Conrad*, 2006-Ohio-3561, ¶ 16 ("A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial."). "[W]e are not concerned with the substance of the experts' conclusions; our focus is on how the experts arrived at their conclusions." *Id.*

{¶ 87} Here, Dr. Wade agreed that RULA is a non-specific assessment for upper extremity musculoskeletal disorders, but opined that it was appropriate for use in carpal-tunnel cases, as carpal tunnel is a type of upper extremity musculoskeletal disorder. As we mentioned earlier, we interpret Dr. Wade's testimony to mean that he used the most conservative *possible* postures. It is not physically possible for a person to assume an

34.

absolutely neutral position in holding a tool, depressing a trigger to activate the tool, and performing the tasks Smith described. And in any event, the railroad's criticisms go to the weight of Dr. Wade's testimony and not to its admissibility. Dr. Wade did explain that he used the internet to look up weights of particular tools and he described his assumptions with respect to the weights of the tools. His failure to document the source of these assumptions does not render his opinions inadmissible or unreliable. That the publications Dr. Wade relied upon are 30 or 40 years old does not mean those publications are outdated, and his failure to cite literature precisely on point is yet another topic that goes to the weight of his opinions. Finally, it is to be expected that the scope of Dr. Wade's assessments would differ based on whether he is providing opinions in litigation versus writing a paper or consulting for a company. The breadth of his assessment understandably would vary based on the objective of the task at hand. This is again an area for cross-examination—not a deficiency that renders his opinions unreliable or inadmissible.

{¶ 88} Accordingly, we conclude that the trial court erred when it excluded Dr. Wade's expert opinions. We find Smith's second assignment of error well-taken.

### C. Grant of Summary Judgment to the Railroad

{¶ 89} In his third assignment of error, Smith argues that the trial court erred when it granted summary judgment in favor of the railroad. Smith does not concede that expert testimony is necessary to establish a jury question on the issue of whether his carpal

35.

tunnel syndrome was caused by his employment by the railroad, but he insists that if we reverse the trial court's rulings regarding the admissibility of Drs. Ciaccia and Wade's testimony, there is sufficient evidence to establish a genuine issue of fact regarding causation. The railroad continues to argue that the exclusion of Drs. Ciaccia and Wade's testimony means that Smith lacks causation evidence in support of his FELA claim.

{¶ 90} FELA, 45 U.S.C.A. § 51, provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ." To prevail on a FELA claim, a plaintiff must prove duty, breach, foreseeability, and causation. *Vance v. Consol. Rail Corp.,* 73 Ohio St.3d 222, 230 (1995).

{¶ 91} FELA's causation standard is more liberal than the common-law standard, however, and a plaintiff need only show that the employer's negligent conduct "*played any part, even the slightest, in producing the injury*[.]" (Emphasis in original.) *Wilson v. CSX Trans., Inc.,* 2025-Ohio-819, ¶ 17 (1st Dist.). But despite this less stringent standard, "unless the connection between the negligence and the injury is a kind that would be obvious to laymen, expert testimony is required." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 643 (7th Cir.2010), citing *Brooks v. Union Pacific R. Co.*, 620 F.3d 896, 899 (8th Cir.2010).

36.

{¶ 92} Here, we have determined that the trial court erred when it excluded the expert causation opinions of Drs. Ciaccia and Wade. Because we find that their opinions were improperly excluded, summary judgment on the issue of causation—the only element at issue on this appeal—was improper and must be reversed.

{¶ 93} We find Smith's third assignment of error well-taken.

### IV. Conclusion

{¶ 94} We find Smith's first assignment of error well-taken. Smith's treating physician was not required to provide an expert report. Under Civ.R. 26(B)(7)(d), he was permitted to offer opinions as to matters addressed in his records. We conclude that his medical records sufficiently "address" the "matters" about which he offered opinions.

{¶ 95} We find Smith's second assignment of error well-taken. Smith's expert ergonomist utilized a proper scientific method, there existed a factual basis for his opinions, and an acceptable methodology was used in reaching his conclusions. All of the railroad's criticisms of his opinions go to the weight—not the admissibility—of the expert's opinions.

{¶ 96} We find Smith's third assignment of error well-taken. Having found that the trial court improperly excluded the causation testimony of Smith's experts, Smith's claim does not fail for a lack of evidence on the element of causation, thus summary judgment was improperly granted in favor of the railroad.

{¶ 97} We reverse the September 10, 2024 judgments of the Erie County Court of Common Pleas and remand the matter to the trial court for proceedings consistent with

37.

this decision.  Norfolk Southern is ordered to pay the costs of this appeal under App.R. 24.

Judgments reversed<br>and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                                         _____

                                                          JUDGE

Christine E. Mayle, J.

                                         _____

Charles E. Sulek, P.J.                                    JUDGE
CONCUR.

                                         _____
                                         JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.